1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGEL MENDEZ, et al.,<br><br>       Plaintiffs,<br><br>   vs.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>       Defendants. | CASE NO. CV 11-04771-MWF (PJWx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This matter came on for trial before the Court sitting without a jury on February 26, 27, 28, March 1, and April 19, 2013.  Following the presentation of evidence, the parties filed supplemental briefs, and after closing arguments the matter was taken under submission.  The Court then ordered, and the parties filed, supplemental briefs regarding *Alexander v. City of San Francisco*, 29 F.3d 1355 (9th Cir. 1994), and *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002).

Having carefully reviewed the record and the arguments of counsel, as presented at the hearing and in their written submissions, the Court now makes the following findings of fact and reaches the following conclusions of law pursuant to Federal Rules of Civil Procedure 52.  Any finding of fact that constitutes a

1

conclusion of law is also hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

## I. FINDINGS OF FACT

1.     On October 1, 2010, at approximately 12:30 p.m..  Defendants Los Angeles County Sheriff's Department Deputies Christopher Conley and Jennifer (Pederson) Ballis shot Plaintiffs Angel Mendez and Jennifer Lynn Garcia multiple times.  Plaintiffs were living together as a couple when the shooting occurred and thereafter married  At trial and in these Findings of Fact and Conclusions of Law, they are therefore typically referred to as Mr. & Mrs. Mendez.

2.     When shot, Mr. and Mrs. Mendez were lying on a futon in the shack in which they resided.  Deputies Conley and Pederson were searching for a parolee-at-large named Ronnie O'Dell.

3.     At all relevant times, Deputies Conley and Pederson were acting under color of authority of their employment with the County of Los Angeles ("COLA").

## A.     THE SEARCH FOR MR. O'DELL

4.     Sergeant Greg Minster was a supervisor for the Lancaster, California Station Target Oriented Policing ("TOP") Team.

5.     Among other things, Sergeant Minster's TOP Team tracked parolees-at-large.

6.     Deputies Billy J. Cox and Veronica Ramirez were assigned to Sergeant Minster's TOP Team.

7.     Prior to October 2010, Sergeant Minster's TOP Team had been searching for, and attempting to apprehend, Mr. O'Dell.

8.     Mr. O'Dell was a wanted felony suspect whom the TOP Team categorized as armed and dangerous.

9.     There was a warrant for Mr. O'Dell's arrest.

10.     Mr. O'Dell had evaded prior attempts to apprehend him.

**B.   ON OCTOBER 1, 2010, MR. O'DELL REPORTEDLY WAS SPOTTED AT AN ALBERTSON'S GROCERY STORE IN LANCASTER**

11.   On the morning of October 1, 2010, Officer Adam Zeko observed a man he believed to be Mr. O'Dell entering an Albertson's grocery store located at the intersection of 20th Street and K Street in Lancaster.

12.   Officer Zeko reported to the Lancaster Station that he thought he had seen Mr. Odell.

13.   Approximately twelve police officers, including Deputies Conley and Pederson, responded to the Albertson's.

14.   Deputies Conley and Pederson were partners assigned to the Lancaster Station Community Oriented Policing ("COPS") Unit.

15.   However, on October 1, 2010, Deputies Conley and Pederson were directed to supplement and assist Sergeant Minster's TOP Team.

16.   Prior to October 1, 2010, Deputies Conley and Pederson did not have any information regarding Mr. O'Dell.

17.   Mr. O'Dell was not found or captured at the Albertson's.

**C.   THE RESPONDING OFFICERS THEN MET BEHIND THE ALBERTSON'S**

18.   The responding officers then met behind the Albertson's to debrief.

19.   During the debriefing session, Deputy Claudia Rissling received a tip from a confidential informant that a man he believed to be Mr. O'Dell was riding a bicycle in front of 43263 18th Street West in Lancaster, a private residence owned by Paula Hughes.

20.   The responding officers then developed a plan in light of the tip regarding Mr. O'Dell's whereabouts.

21.   A team of officers would proceed to the residence of Roseanne Larsen, which was located at 43520 18th Street West, Lancaster, California.

22.     The officers had information that Mr. O'Dell previously had been at the Larsen residence, and the officers believed that there was a possibility that Mr. O'Dell already had left the Hughes residence.

23.     At the same time, Sergeant Minster's TOP Team, as well as Deputies Conley and Pederson, would proceed to the Hughes residence.

24.     Deputies Conley and Pederson were assigned to clear the rear of the Hughes property for the officers' safety (should Mr. O'Dell be hiding thereabouts) and cover the back door of the Hughes residence for containment (should Mr. O'Dell try to escape to the rear of the Hughes property).

25.     During the debriefing/planning session, Deputy Rissling announced to the responding officers that a male named Angel (Mendez) lived in the backyard of the Hughes residence with a pregnant lady (Mrs. Mendez).

26.     Deputies Conley and Pederson heard Deputy Rissling make this announcement.  Deputy Pederson testified that she heard the announcement. Deputy Conley testified that he did not recall any such announcement.  Either he did not recall the announcement at trial or he unreasonably failed to pay attention when the announcement was made.

## D.     SERGEANT MINSTER AND DEPUTIES COX, RAMIREZ, CONLEY AND PEDERSON PROCEEDED TO THE HUGHES RESIDENCE

27.     Sergeant Minster and Deputies Cox, Ramirez, Conley and Pederson proceeded to the Hughes residence, arriving in three different patrol cars.

### 1.     The Hughes Residence and Property

28.     Ms. Hughes lived in a private residence located at 43263 18th Street West in Lancaster, California.

29.     The front of the Hughes residence faced east.

30.     The rear of the Hughes residence faced west.

31.     To the south of the Hughes residence was a gate that led to the rear of the property.

4

32.     If one walked westward through the south gate, one would pass between the Hughes residence (to the north) and three metal storage sheds (to the south).

33.     The three storage sheds were located within a concrete wall that ran the length of the southern boundary of the Hughes property.

34.     Behind (*i.e.*, to the west of) the Hughes residence, a short, lightweight fence enclosed a grassy backyard area.

35.     To the west of the backyard fence the ground surface was dirt, not grassy.

36.     There was debris throughout the rear of the Hughes property, including abandoned automobiles located in the northwest corner of the rear property.

**2.     The Mendez Shack**

37.     Ms. Hughes and Mr. Mendez were friends from high school.

38.     Mr. and Mrs. Mendez lived in a shack located in the rear of the property owned by Ms. Hughes.

39.     The shack was located in the dirt-surface area to the rear of the Hughes property approximately thirty feet west of the Hughes residence – *i.e.*, west of the backyard fence, and southeast of the abandoned automobiles.

40.     Mr. Mendez had constructed the shack out of wood and plywood.

41.     Mr. and Mrs. Mendez had been living in the shack for approximately ten months.

42.     Mr. and Mrs. Mendez were not yet married.

43.     Mrs. Mendez was five-months pregnant.

44.     The shack was approximately seven-feet wide, seven-feet long, and seven-feet tall.

45.     The shack had a single doorway entrance that faced east toward the Hughes residence.

46.     The doorway was approximately six-feet tall and three-feet wide.

5

47.     In the doorway, from the top of the doorframe, hung a blue blanket.

48.     Outside of the blue blanket was a hinged wooden door, which opened to the outside of the shack.

49.     Outside of the wooden door was a hinged screen door, which opened to the outside of the shack.

50.     The shack did not have any windows or other points of entry or exit.

51.     Located a few feet to northeast of the shack was a white gym storage locker that contained clothes, coats and other possessions.

52.     There were also clothes and other possessions located a few feet to the east of the shack.

53.     There was a tree to the north of the shack and the white gym storage locker.

54.     There was a blue tarp covering the roof of the shack.

55.     There was an electrical cord running into the shack.

56.     There was a water hose running into the shack.

57.     There was an air conditioner mounted on the north side of the shack.

58.     Inside the shack was a full-size futon.

59.     The futon ran lengthwise against the back (western) interior wall of the shack.

60.     The other (eastern) side of the futon was approximately three feet from the doorway to the shack.

61.     Mr. Mendez kept a BB gun rifle in the shack in order to shoot rats, mice and other pests.

62.     The BB gun rifle had a black barrel, brown stock and orange safety switch.

63.     The butt end of the BB gun rifle had been broken off from the barrel after someone had stepped on it.

64.     The Court examined the BB gun rifle at trial, but the BB gun rifle was not admitted as an exhibit.  The BB gun rifle closely resembled a small caliber rifle.

65.     Ms. Hughes sometimes would open the door to the shack unannounced to "prank" or play a joke on Mr. and Mrs. Mendez.

**E.     SERGEANT MINSTER AND DEPUTIES COX, RAMIREZ, CONLEY AND PEDERSON APPROACHED THE HUGHES RESIDENCE**

66.     When Sergeant Minster and Deputies Cox, Ramirez, Conley and Pederson arrived at the Hughes residence, they observed a bicycle on the front lawn.

67.     The officers did not have a search warrant to search the Hughes residence.

68.     Sergeant Minster directed Deputies Conley and Pederson to proceed to the back of the Hughes residence through the south gate.

69.     Sergeant Minster and Deputies Cox and Ramirez went to the front door of the Hughes residence.

70.     Sergeant Minster banged on the security screen outside the front door.

71.     Sergeant Minster testified that if both the front door and the security screen had been open, he would have gone to the front door to see if someone was going to come to the front door and then contacted that person.

72.     From within the Hughes residence, a woman (Ms. Hughes) asked what the officers wanted.

73.     Sergeant Minster asked Ms. Hughes to open the door.

74.     Ms. Hughes asked if the officers had a warrant.

75.     Sergeant Minster said that they did not, but that they were searching for Mr. O'Dell and had a warrant to arrest him.

76.     Sergeant Minster then heard running within the Hughes residence, toward the back of the residence.

77.     Sergeant Minster believed Mr. O'Dell was within the Hughes residence.

78.     Sergeant Minster directed Deputies Cox and Ramirez to retrieve the pick and ram because Ms. Hughes no longer was communicating from within the residence.

79.     Deputy Cox set the pick into the left side of the doorframe.

80.     At that point, Ms. Hughes again communicated from within the residence.

81.     Sergeant Minster again stated that the officers were looking for Mr. O'Dell.

82.     Ms. Hughes responded that Mr. O'Dell was not at her residence.

83.     Sergeant Minster again requested that the officers be allowed to search her residence.

84.     Ms. Hughes opened the front door and the security screen.

85.     Ms. Hughes was pushed to the ground and handcuffed.

86.     Deputy Ramirez placed Ms. Hughes in the backseat of one of the patrol cars.

87.     Sergeant Minster and Deputy Cox searched for Mr. O'Dell in the Hughes residence.

88.     The officers did not find Mr. O'Dell, or anyone else, in the Hughes residence.

**F.     DEPUTIES CONLEY AND PEDERSON CLEARED THE THREE STORAGE SHEDS**

89.     Meanwhile, Deputies Conley and Pederson headed west through the south gate of the Hughes residence – *i.e.*, the gate to the south of the Hughes residence that led to the rear of the property.

90.      Deputies Conley and Pederson checked each of three storage sheds between the Hughes residence and the southern wall bordering the Hughes property.

91.     Deputies Conley and Pederson had their guns drawn because they were searching for Mr. O'Dell, whom they believed to be armed and dangerous.

92.    Deputies Conley and Pederson did not find Mr. O'Dell, or anyone else, in the three storage sheds between the Hughes residence and the southern wall bordering the Hughes property.

93.    At the time Deputies Conley and Pederson entered the backyard of the Hughes residence, the back door of the Hughes residence was open; Sergeant Minster and Deputy Cox were inside the Hughes residence.

94.    Deputy Pederson informed Sergeant Minster that she and Deputy Conley would clear the remainder of the property to the rear of the Hughes residence.

95.    Sergeant Minster assented.

## G.    DEPUTIES CONLEY AND PEDERSON APPROACHED THE MENDEZ SHACK

### 1.    The Deputies' Point of View

96.    Deputies Conley and Pederson proceeded west into the dirt-surface area to the rear (west) of the Hughes property.

97.    Deputies Conley and Pederson did not have a search warrant to search the shack.

98.    Deputies Conley and Pederson did not "knock and announce" their presence at the shack.

99.    Deputies Conley and Pederson recognized that the shack had a door.

100.   Deputies Conley and Pederson were trained not to approach or stand in front of a door in case there was a threat behind the door.

101.   Consequently, Deputies Conley and Pederson approached the shack from the south – i.e., to the left of the door (from the Deputies' point of view).

102.   As they approached the shack, Deputy Conley was in front of Deputy Pederson.

103.   The wooden door to the shack was closed; the screen door to the shack was open.

104.    Prior to opening the door to the shack, Deputy Conley did not feel threatened.

105.    Deputy Conley and Deputy Pederson both testified that they did not perceive the shack to be a habitable structure.  The Court finds that they acted as they did because they believed the shack to be simply another storage shed, similar to the three on the south side of the property that they had already searched.  Therefore, it was their perception that the only person who might have been in the shack would have been Mr. O'Dell, trying to remain hidden.

106.    Having listened to the testimony and examined numerous photographs of the Hughes property, the Court finds that this perception of Deputies Conley and Pederson was not reasonable.  They had been told that the shack was inhabited.  The shack was a different structure from the sheds.  The shack was in a different location.  The following were all indicia of habitation:  The air conditioner, electric cord, water hose, and clothes locker.

107.    In photographs of the scene admitted into evidence, the door to the clothes locker was open.  Neither Mr. Mendez, Mrs. Mendez, nor Deputy Pederson testified to whether the door of the clothes locker was open at the time of the incident.  Deputy Conley testified that he did not remember whether the door was open.

108.    Deputy Conley opened the wooden door to the shack.

109.    Deputy Conley pulled back the blue blanket that was hanging from the top of the doorframe.

110.    As Deputy Conley pulled back the blue blanket, Deputies Conley and Pedersen saw the silhouette of an adult male (Mr. Mendez) holding – what they believed to be – a rifle.

1   **2.   Mr. and Mrs. Mendez's Point of View**

2   111.   Mr. and Mrs. Mendez were napping on the futon inside the shack.

3   112.   Mr. and Mrs. Mendez were lying with their bodies in a north-south

4   direction and with their heads to the north side of the futon/shack.

5   113.   Mr. and Mrs. Mendez were lying side-by-side on the futon with Mrs.

6   Mendez to Mr. Mendez's right – west of him.

7   114.   Mrs. Mendez was closer to the back (western) interior wall of the

8   shack.

9   115.   Mr. Mendez was closer to the door of the shack (on the east side of the

10  shack).

11  116.   Mr. Mendez had the BB gun rifle next to him on the futon – to his left,

12  east of him.

13  117.   The barrel of the BB gun rifle pointed south.

14  118.   When Mr. Mendez perceived the wooden door being opened, he

15  thought it was Ms. Hughes playing a joke.

16  119.   As the wooden door opened, Mr. Mendez picked up the BB gun rifle to

17  put it on the floor of the shack so that he could put his feet on the floor of the shack

18  and sit up.

19  120.   Mrs. Mendez also perceived the door opening but was lying on her

20  right side, facing the back (western) interior wall of the shack.

21  **3.   Whether the BB Gun Rifle Was Pointed at Deputies Conley and
22      Pederson**

23  121.   The witness testimony conflicts as to how and where Mr. Mendez was

24  holding the BB gun rifle, whether and in what direction he was moving the BB gun

25  rifle, and whether Mr. Mendez pointed the BB gun rifle (intentionally or otherwise)

26  at Deputies Conley and Pederson.

27  122.   In court, Mr. Mendez attempted a reenactment of his getting out of bed

28  with the BB gun rifle.  Based on that demonstration and the testimony of the all the

1  witnesses, the Court finds that the barrel of the BB gun rifle would necessarily have
2  pointed somewhat south towards Deputy Conley, even if the intent of Mr. Mendez
3  was simply to use the BB gun rifle to help him sit-up.

4        123.   Deputies Conley and Pederson perceived Mr. Mendez holding the BB
5  gun rifle.

6        124.   Deputies Conley and Pederson ***reasonably*** believed that the BB gun
7  rifle was a firearm rifle.

8        125.   Deputies Conley and Pederson ***reasonably*** believed that the man (Mr.
9  Mendez) holding the firearm rifle (a BB gun rifle) threatened their lives.

10 **H.    DEPUTIES CONLEY AND PEDERSON FIRED THEIR GUNS**

11       126.   Almost immediately, Deputy Conley yelled, "Gun!"

12       127.   And, almost immediately, both Deputies Conley and Pederson fired
13 their guns in the direction of Mr. Mendez, fearing that they would be shot and killed.

14       128.   At the time they fired their guns, neither Deputy Conley nor Deputy
15 Pederson saw Mrs. Mendez.

16       129.   Mr. Mendez screamed, "Stop shooting!  Stop shooting!"

17       130.   Deputy Conley fired ten times while moving backward (east) away
18 from the shack.

19       131.   Deputy Pederson fired five times while moving backward (east) and to
20 her left (south).

21       132.   According to their training, Deputies Conley and Pederson were
22 "shooting and moving" until there was no threat.

23       133.   Mr. O'Dell was not found in the shack or captured elsewhere that day.

24       134.   No one was inside the shack other than Mr. and Mrs. Mendez.

25 **I.    MR. AND MRS. MENDEZ WERE INJURED**

26       135.   The gunshots injured both Mr. and Mrs. Mendez.

27       136.   Mr. and Mrs. Mendez were shot multiple times and suffered severe
28 injuries.

1    137.   Mr. Mendez was shot in the right forearm, right shin, right hip/thigh,

2    right lower back, and left foot.

3    138.   Mr. Mendez's right leg was amputated below the knee.

4    139.   Mrs. Mendez was shot in the right upper back/clavicle, and a bullet

5    grazed her left hand.

6    140.   The Sheriff's Department documented nine bullet holes in and around

7    the shack and collected four bullets.

8    141.   The Sheriff's Department did not determine which bullets were fired

9    from Deputy Conley's gun and which were fired from Deputy Pederson's gun.

10   142.   The Sheriff's Department did not determine how many or which bullets

11   struck Mr. and/or Mrs. Mendez or whether Deputy Conley or Deputy Pederson fired

12   each or any of the bullets that struck Mr. and/or Mrs. Mendez.

13   **J.    DAMAGES**

14   143.   Mr. and Mrs. Mendez's medical bills were admitted into evidence.

15   144.   Jalil Rashti, M.D., an orthopedic surgeon, testified to his treatment of

16   Mr. and Mrs. Mendez.

17   145.   Dr. Rashti also testified to Mr. and Mrs. Mendez's future medical care

18   and provided an estimate as to the cost of future attendant care for Mr. Mendez.

19   146.   There was no testimony regarding Mr. or Mrs. Mendez's life

20   expectancy.

21   147.   Mr. Mendez testified that, prior to the incident, he had earned from

22   $1,400 to $2,400 per month as a construction "freelancer" or "gopher," landscaping,

23   and working for a sanitation company.

24   148.   Mr. Mendez also testified that he had not worked since 2008.

25   149.   Mr. and Mrs. Mendez each testified to their emotional and

26   psychological suffering.

27   150.   Lawrence J. Coates, Ph.D., a licensed psychologist, testified to his

28   treatment of Mr. and Mrs. Mendez.

151.   Plaintiffs filed a Statement of Damages.   (Docket No. 230). Defendants filed Objections to Plaintiffs' Statement of Damages.  (Docket No. 234). Certain of the objections were well taken; moreover, certain requested amounts were logically unsupported or simply grandiose.  Nonetheless, *some* amount of damages for certain categories are undoubtedly deserved.  The Court examined the underlying exhibits and used common sense in deciding the various sums for damages.

152.   The position of Plaintiffs is that Mr. Mendez's life expectancy is 81 years but did nothing to establish that number in the record.  To the limited extent it matters, the Court believes that 70 years would be more appropriate, given the pre-shooting circumstances of Mr. Mendez's life.

153.   The Court did not discount the medical damages to the present value, in recognition of inflation in general and the undoubted rise in the costs of medical care in particular.  The Court discounted the requested amount of future earnings, both because of the sporadic nature of Mr. Mendez's employment as a manual laborer and very roughly to reflect present value.

## II.  CONCLUSIONS OF LAW

Pursuant to 42 U.S.C. § 1983, Mr. and Mrs. Mendez allege various claims under the Fourth Amendment (as applied to Defendants through the Fourteenth Amendment) of the United States Constitution.  Mr. and Mrs. Mendez also allege several related California tort claims.  Defendants argue that Mr. and Mrs. Mendez's Fourth Amendment claims fail because Deputies Conley and Pederson are shielded from liability by qualified immunity, and that Mr. and Mrs. Mendez's tort claims fail because the Deputies' conduct was reasonable under the circumstances.

### A.  QUALIFIED IMMUNITY

When the defense of qualified immunity is raised, there are two threshold questions a court must answer.  First, was there a violation of a constitutional right?  Second, was that right clearly established?  *Saucier v. Katz*, 533 U.S. 194, 201, 121

14

S. Ct. 2151, 150 L. Ed. 2d 272 (2001).  Under the second *Saucier* prong, the question is whether the constitutional right at issue was clearly established "'in light of the specific context of the case.'"  *Scott*, 550 U.S. at 377 (quoting *Saucier*, 533 U.S. at 201).  "Under *Saucier*'s qualified immunity inquiry, the second question requires the court to ask whether a reasonable officer could have believed that his conduct was lawful."  *Dixon v. Wallowa County*, 336 F.3d 1013, 1019 (9th Cir. 2003).

"The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"  *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (citing *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S. Ct. 1284, 157 L.Ed.2d 1068 (2004)).

Furthermore, "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right."  *Reichle v. Howards*, -- U.S. --, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012) (citation and internal quotation marks omitted).  "In other words, existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.* (citation and internal quotation marks omitted).  "This 'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably . . . anticipate when their conduct may give rise to liability for damages."  *Id.* (citation and internal quotation marks omitted).

However, the "question is not whether an earlier case mirrors the specific facts here.  Rather, the relevant question is whether 'the state of the law at the time gives officials fair warning that their conduct is unconstitutional.'"  *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013) (citing *Bull v. City of San Francisco*, 595 F.3d 964, 1003 (9th Cir. 2010) (en banc) ("[T]he specific facts of previous cases need not be materially or fundamentally similar to the situation in

1  question.")); *White v. Lee*, 227 F.3d 1214, 1238 (9th Cir. 2000) ( "Closely analogous

2  preexisting case law is not required to show that a right was clearly established.")

3  (citations omitted); *see also Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir.

4  2004) ("If the right is clearly established by decisional authority of the Supreme

5  Court or this Circuit, our inquiry should come to an end.  On the other hand, when

6  there are relatively few cases on point, and none of them are binding, we may

7  inquire whether the Ninth Circuit or Supreme Court, at the time the out-of-circuit

8  opinions were rendered, would have reached the same results." (citation and internal

9  quotation marks omitted)).

10  **B.**     **FOURTH AMENDMENT:  UNREASONABLE SEARCH**

11      Mr. and Mrs. Mendez first argue that Deputies Conley and Pederson violated

12  their Fourth Amendment right to be free from an unreasonable search.

13      Under the Fourth Amendment, "we inquire, serially, whether a search has

14  taken place; whether the search was based on a valid warrant or undertaken pursuant

15  to a recognized exception to the warrant requirement; whether the search was based

16  on probable cause or validly based on lesser suspicion because it was minimally

17  intrusive; and, finally, whether the search was conducted in a reasonable manner."

18  *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 641-42, 109 S. Ct. 1402, 103

19  L. Ed. 2d 639 (1989) (citations omitted).

20      The Court addresses each of these elements in turn below.

21      **1.**     **Expectation of Privacy**

22      The United States Supreme Court "uniformly has held that the application of

23  the Fourth Amendment depends on whether the person invoking its protection can

24  claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has

25  been invaded by government action."  *Smith v. Maryland*, 442 U.S. 735, 740-41, 99

26  S. Ct. 2577, 61 L. Ed. 2d 220 (1979) (citing cases).

27      "In accordance with the common law, our Fourth Amendment precedents

28  recogniz[e] . . . that rights such as those conferred by the Fourth Amendment are

16

personal in nature, and cannot bestow vicarious protection on those who do not have a reasonable expectation of privacy in the place to be searched." *Minnesota v. Carter*, 525 U.S. 83, 101, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998) (citation and internal quotation marks omitted). "The claimant must establish that he personally had a legitimate expectation of privacy in the premises he was using and therefore could claim the protection of the Fourth Amendment with respect to a governmental invasion of those premises." *McDonald v. City of Tacoma*, No. 11-cv-5774-RBL, 2013 WL 1345349, at *3 (W.D. Wash. Apr. 2, 2013) (citing *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978)).

"To establish a constitutionally protected reasonable expectation of privacy, [the plaintiff] must demonstrate both a subjective and objective expectation of privacy." *United States v. Rivera*, 10 F. App'x 617, 620 (9th Cir. 2001) (citing *California v. Ciraolo*, 476 U.S. 207, 211, 106 S. Ct. 1809, 90 L. Ed. 2d 210 (1986)). Mr. and Mrs. Mendez "have the burden of establishing that, under the totality of the circumstances, the search or the seizure violated their legitimate expectation of privacy." *United States v. Silva*, 247 F.3d 1051, 1055 (9th Cir. 2001) (citation omitted).

In this case, the question is whether Mr. and Mrs. Mendez had a legitimate expectation of privacy in the shack.

### a. *The Mendez Shack Was Within the Curtilage of the Hughes Residence*

"The presumptive protection accorded people at home extends to outdoor areas traditionally known as 'curtilage' – areas that, like the inside of a house, 'harbor[] the intimate activity associated with the sanctity of a [person's] home and the privacies of life.'" *United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) (citing *United States v. Dunn*, 480 U.S. 294, 300, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987)).

17

"[C]ourts have [therefore] extended Fourth Amendment protection to the curtilage to a home, defining the extent of the curtilage with reference to four factors":

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by."

*Id.* at 739 (citation and internal quotation marks omitted) (citing *Dunn*, 480 U.S. at 301). "Every curtilage determination is distinctive and stands or falls on its own unique set of facts." *United States v. Depew*, 8 F.3d 1424, 1426 (9th Cir. 1993).

In this case, the shack was approximately thirty feet from the Hughes residence. While the shack was not within the fence that enclosed the grassy backyard area, it was located in the dirt-surface area that was part of the rear of the Hughes property. Mr. Mendez himself had constructed the shack. Mr. and Mrs. Mendez had lived in the shack for ten months before the date of the incident. Finally, there is no evidence in the record that people passing by the Hughes residence on 18th Street West could observe the shack without passing through the south gate and entering the rear of the Hughes property.

Therefore, under the *Dunn* factors, the shack was within the curtilage of the Hughes residence.

### b.   *Even if the Shack Was Without the Curtilage of the Hughes Residence, It Was a Protected Structure*

Moreover, the "Fourth Amendment protects structures other than dwellings. '[O]ne may have a legally sufficient interest in a place other than her own house so as to extend Fourth Amendment protection from unreasonable searches and seizures in that place. [A] structure need not be within the curtilage in order to have Fourth Amendment protection.'" *United States v. Santa Maria*, 15 F.3d 879, 882-83 (9th Cir. 1994) (citing *United States v. Broadhurst*, 805 F.2d 849, 851, 854 n.7 (9th Cir. 1986)) (citing *United States v. Hoffman*, 677 F. Supp. 589, 596 (E.D. Wis. 1988)

18

1   ("[A] person can have a protected expectation of privacy in buildings (*i.e.*, barns,

2   garages, boathouses, stables, etc.) that are located far outside the area of the

3   curtilage of the home.")) (citing cases); *see also United States v. Burke*, No. CR. S-

4   05-0365 FCD, 2009 WL 173829, at *12 (E.D. Cal. Jan. 23, 2009) ("[A]s with a

5   residence, the court looks to the totality of the circumstances in determining whether

6   a defendant has a legitimate expectation of privacy in a storage area." (citing *United

7   States v. Silva*, 247 F.3d 1051, 1056 (9th Cir. 2001)).

8        For the same reasons discussed above, even if the shack was without the

9   curtilage of the Hughes residence, the shack was a protected structure.

10              **c.    *The Shack Was a Separate Dwelling Unit***

11        Regardless of whether the shack was within or without the curtilage of the

12   Hughes residence, "there is no Fourth Amendment rule that provides for protection

13   only for traditionally constructed houses." *United States v. Barajas-Avalos*, 377

14   F.3d 1040, 1046 (9th Cir. 2004) (internal quotation marks omitted) (discussing

15   Fourth Amendment rights in twelve-foot travel trailer). "It is quite true that a person

16   has a right to privacy in his dwelling house, or temporary sleeping quarters, whether

17   in a hotel room, a trailer, or in a tent in a public area . . . ." *Id.* at 1055.

18        "Because the home is accorded the full range of Fourth Amendment

19   protections against unlawful searches and seizures, an unconsented police entry into

20   a residential unit (whether a house, apartment, or hotel room) constitutes a search

21   for which a warrant must be obtained." *United States v. Cannon*, 264 F.3d 875, 879

22   (9th Cir. 2001) (citations and internal quotation marks omitted).

23        In *Cannon*, there were two structures within the fence that surrounded the

24   defendant's residence at 1250 Hemlock Street in Chico, California. *Id.* at 877. The

25   government agent "***reasonably assumed***" that the second structure was a garage. *Id.*

26   at 878 (emphasis added) ("In the evidentiary hearing, the district court found that

27   before executing the warrant on 1250 Hemlock, the DEA agent reasonably believed

28   the rear building to be a garage.").

However, the defendant (Mr. Cannon) had converted the rear building from a garage into a self-contained residential unit approximately twenty years earlier.  *Id.* Mr. Cook rented the rear building's residential unit from Mr. Cannon.  The rear building itself consisted of three areas with separate entrances:  Mr. Cook's dwelling unit and two storage rooms.  *Id.*

Based on the facts of that case, the Ninth Circuit concluded that the "rental unit was clearly a separate dwelling for which a separate warrant was required" and that it could not "be viewed as an extension of the main house."  *Id.* at 879 (citation omitted) ("Similarly, a search of a guest room in a single family home which is rented or used by a third party, and, to the extent that the third party acquires a reasonable expectation of privacy, requires a warrant." (citing *Rakas v. Illinois*, 439 U.S. 128, 140, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978)).

Significantly, the Ninth Circuit concluded that Mr. Cook's residential unit was a separate dwelling even though the "entire rear building at 1250 Hemlock **qualifie[d] as curtilage of Cannon's residence**."  *Id.* at 881 ("Cook possessed a reasonable expectation of privacy in the rear building rooms he rented . . . .").  Indeed, the Ninth Circuit concluded further that, on the facts of that case, the "storage rooms were an extension of defendant Cannon's residence."  *Id.*  garages in Chico had often been converted without permits into student residences.  *Id.* at 878.  Had the rear structure still been a garage, then the warrant for the main house would have covered that garage as well.  *Id.* at 880.

*United States v. Greathouse*, 297 F. Supp. 2d 1264 (D. Or. 2003), is illustrative.  In *Greathouse*, the district court began its analysis by noting the Ninth Circuit's observation in *Cannon* that the "rental unit contained its own kitchen appliances and its own bathroom."  *Id.* at 1274.  The district court continued:

> The government argues that because the defendant's bedroom was not a self-contained unit with its own appliance and bathrooms, and because there was no separate lock, number or entrance, the officers

necessarily acted reasonably in concluding that the entirety of the residence was occupied in common.

First, I note that the focus under *Maryland v. Garrison* must be upon the reasonableness of the officers' actions under the circumstances. When they entered the residence, they did not know that the defendant in fact kept to himself in his bedroom. However, I disagree with the government's assertion that the physical layout is dispositive. ***Doorbells, deadbolts and separate appliances are certainly indicia of separate units, but nothing in the case law indicates that these are prerequisites.*** Nor is there any support for the assumption that unrelated people who share a house, but maintain separate bedrooms have no independent right to privacy in bedrooms maintained for their exclusive use. In this case, there is no dispute that the kitchen, bathroom and living room areas were occupied in common. There is also no dispute that the defendant's bedroom door was closed when the officers and agents entered and that he had a "Do Not Enter" sign posted on his door. There was no lock on the door, no number and no separate door bell.

However, the agents and officers were immediately advised by [another resident] that the defendant was a renter and that he lived in the back bedroom on the first floor. It was also apparent to the officers that there was no familial relation between any of the residents; they were simply a group of people sharing a house. I find that, upon learning this information from [the resident], when coupled with the sign on the defendant's door and the apparent absence of any familial or other connection between the residents, ***the agents at that point should have known there were separate residences within the house and should have stopped and obtained a second warrant for the defendant's bedroom. There is no question that they could have secured the area and obtained a telephonic warrant without fear of destruction of evidence. Their failure to do [so] is an alternative basis for suppression of the evidence.***

*Id.* at 1274-75 (emphasis added).

In *United States v. Flyer*, No. CR051049TUC-FRZ(GEE), 2006 WL 2590460 (D. Ariz. May 26, 2006), the district court distinguished *Cannon* on the facts, concluding that *Cannon* did not "support[] the necessity of a separate warrant to search the defendant's room in this case." *Id.* at *4. In *Flyer*, the district court ruled that "there was no need for a separate search warrant before searching the defendant's room" based on the following facts:

The defendant's room was within the single family residence described in the affidavit and search warrant. There was no separate

21

entrance to his room from the outside of the residence. While he apparently was free to eat meals in his room, he had no refrigerator or cooking stove in his room and no separate bathroom. Although his mother described him as a "boarder", she admitted he paid no rent and was free to eat the food she purchased for the household. Although the defendant expected other household members would "respect" his privacy and not enter his room without his consent, he did not affix another lock to his room to insure his privacy. There is no evidence the defendant objected to the search of his room during the execution of the warrant.

*Id.*

Several other cases that predate *Cannon* are instructive. In *Maryland v. Garrison*, 480 U.S. 79, 107 S. Ct. 1013, 94 L. Ed. 2d 72 (1987), the police officers obtained and executed a warrant to search the person of Lawrence McWebb and the "premises known as 2036 Park Avenue third floor apartment." *Id.* at 80. While the officers "reasonably believed" that there was only one apartment on the premises, the third floor was divided into two apartments, one occupied by Mr. McWebb and the other by the defendant. *Id.* But before the officers executing the warrant realized that they were in a separate apartment occupied by the defendant, they discovered the contraband that provided the basis for his later conviction. *Id.*

According to the United States Supreme Court,

> If the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search to McWebb's apartment. Moreover, as the officers recognized, they were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant.

*Id.* at 86-87. Therefore, the question was whether the failure of the officers to recognize the overbreadth of the warrant was reasonable. *Id.*

In *Mena v. City of Simi Valley*, 226 F.3d 1031 (9th Cir. 2000), the officers secured a warrant to search a "poor house" – "a residence with a large number of

1    subjects residing in a residence designed for one family." *Id.* at 1035.  The

2    plaintiffs, who owned the residence, argued that the search violated their

3    constitutional rights because, "even after realizing that there were multiple units

4    within the [plaintiffs'] house, the police searched the entire premises, including the

5    individual residential units." *Id.* at 1038.  The Ninth Circuit rejected the defendant

6    officers argument that the "execution of the search was valid because probable cause

7    existed to search the entire premises, not just [the suspect]'s room and the common

8    areas." *Id.*  The Ninth Circuit determined that the officers should have realized that

9    the house in fact consisted of a multi-unit residential dwelling, and therefore were

10   obliged to limit their search.  *Id.*

11          Here, *Cannon* is determinative for these reasons:

12          ***First***, Deputies Conley and Pederson differentiated (or should have

13   differentiated) the shack from the three storage sheds next to (to the south of) the

14   Hughes residence.  The shack was located in a different area of the rear of the

15   Hughes property at a distance from the Hughes residence and the storage sheds.

16   The storage sheds were metal.  The shack was wood.

17          ***Second***, Deputies Conley and Pederson observed (or should have observed) a

18   number of objective indicia demonstrating that the shack was a separate residential

19   unit:  the shack had a doorway; the shack had a hinged wooden door and a hinged

20   screen door; a white gym storage locker was located nearby the shack; clothes and

21   other possessions also were located nearby the shack; a blue tarp covered the roof of

22   the shack; an electrical cord ran into the shack; a water hose ran into the shack; and

23   an air conditioner was mounted on the side of the shack.

24          ***Third***, and importantly, Deputies Conley and Pederson had information that a

25   man and woman lived in the rear of the Hughes property.  In light of this

26   information, and unlike *Cannon* and similar cases, Deputies Conley and Pederson

27   could not have "reasonably assumed" that the shack was another storage shed.

28          Therefore, the shack was a separate dwelling unit under *Cannon*.

23

### d.   *Mr. and Mrs. Mendez Had a Reasonable Expectation of Privacy in the Shack*

The "Fourth Amendment protects people, not places." *United States v. Jones*, 132 S. Ct. 945, 950, 181 L. Ed. 2d 911 (2012) (citing *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)). Consequently, the question is not whether the shack was a protected structure, but whether Mr. and Mrs. Mendez had a reasonable expectation of privacy in the shack.

Mr. Mendez himself had constructed the shack. Before the date of the incident, Mr. and Mrs. Mendez had lived in the shack for ten months. Their possessions were in or around the shack. It was their home. The fact that Ms. Hughes sometimes would open the door to the shack unannounced to "prank" or play a joke on them is insufficient to show that Mr. and Mrs. Mendez did not have a subjective expectation of privacy in the shack or that this expectation was unreasonable.

Accordingly, Mr. and Mrs. Mendez had a subjective expectation of privacy in the shack. And this expectation was reasonable under *Cannon*.

### e.   *Overnight Guest Status*

In addition, the "Supreme Court has carefully examined the surrounding circumstances to determine whether a guest's status is sufficiently like home-occupancy so as to give rise to a reasonable expectation of privacy. In so doing, the Court has distinguished between 'overnight guests' and those who were simply on the premises with the owner's permission":

> In the case of the overnight guest, the Supreme Court reasoned that an overnight guest seeks shelter in the host's home "precisely because it provide[d] him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows." Thus, the overnight guest's expectation of privacy is recognized and a shared societal norm. The Court contrasted overnight guests with persons simply present on the premises, even with the owner's permission, and concluded that "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not."

*McDonald*, 2013 WL 1345349, at *3 (citing *Minnesota v. Carter*, 525 U.S. 83, 87-90, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998)).

Based on the same set of facts, Mr. and Mrs. Mendez – at the very least – were long-term, overnight guests staying within a protected structure within or without the curtilage of the Hughes residence.  For the reasons discussed above, Mr. and Mrs. Mendez had a subjective and objective expectation of privacy in the shack.

### 2.   Search

"Under the traditional approach, the term 'search' is said to imply" the following:

> some exploratory investigation, or an invasion and quest, a looking for or seeking out.  The quest may be secret, intrusive, or accomplished by force, and it has been held that a search implies some sort of force, either actual or constructive, much or little.  A search implies a prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of the way.  While it has been said that ordinarily searching is a function of sight, it is generally held that the mere looking at that which is open to view is not a "search."

1 Wayne R. LaFave, *Search and Seizure:  A Treatise on the Fourth Amendment* § 2.1(a) (5th ed. 2012) ("The Supreme Court, quite understandably, has never managed to set out a comprehensive definition of the word 'searches' as it is used in the Fourth Amendment.").

Here, Deputy Conley searched the shack when he opened the wooden door and pulled back the blue blanket that hung from the top of the doorframe.  Deputy Pederson, however, did not search the shack.

### 3.   Probable Cause/Warrant Requirement

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) (citations omitted).

1    It is undisputed that Deputy Conley did not have a warrant to search the

2    shack, nor do any of the exceptions to the warrant requirement apply.

3              **a.    *Consent***

4    The "consent of one who possesses common authority over premises or

5    effects is valid as against the absent, nonconsenting person with whom that authority

6    is shared." *United States v. Matlock*, 415 U.S. 164, 170, 94 S. Ct. 988, 39 L. Ed. 2d

7    242 (1974). "But the Fourth and Fourteenth Amendments require that a consent not

8    be coerced, by explicit or implicit means, by implied threat or covert force. For, no

9    matter how subtly the coercion was applied, the resulting 'consent' would be no

10   more than a pretext for the unjustified police intrusion against which the Fourth

11   Amendment is directed." *Schneckloth*, 412 U.S. 218, 228.

12   The Court assumes for purposes of this analysis that Ms. Hughes could have

13   consented to a search of the shack. Ms. Hughes opened her front door and the

14   security screen only after Sergeant Minster and Deputies Cox and Ramirez had

15   brought the pick and ram out from the patrol car and set the pick against her

16   doorframe. To the extent that this can be construed as "consent," it was coerced and

17   consequently invalid. Nor, for that matter, did Ms. Hughes give any indication of

18   consent to Deputy Conley's search of the shack.

19   Furthermore, Mr. and Mrs. Mendez did not consent to the search of the shack.

20             **b.    *Parolee Search***

21   "[B]efore conducting a warrantless search [of a residence] pursuant to a

22   parolee's parole condition, law enforcement officers must have probable cause to

23   believe that the parolee is a resident of the house to be searched." *United States v.*

24   *Franklin*, 603 F.3d 652, 656 (9th Cir. 2010) (citation and internal quotation marks

25   omitted).

26   There is no evidence in the record that Mr. O'Dell was a resident of the

27   Hughes residence – on the date of the incident or otherwise. This warrant exception

28   does not apply.

### c.      *Exigency/Emergency Exceptions*

"In particular, [t]here are two general exceptions to the warrant requirement for home searches:  exigency and emergency."  *United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) (citation and internal quotation marks omitted).  The Ninth Circuit has "described these exceptions as follows":

> The "emergency" exception stems from the police officers' "community caretaking function" and allows them "to respond to emergency situations" that threaten life or limb; this exception does "not [derive from] police officers' function as criminal investigators."  By contrast, the "exigency" exception does derive from the police officers' investigatory function; it allows them to enter a home without a warrant if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is "necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts."

*Id.* (citations omitted).  "***To succeed in invoking these exceptions, the government must . . . show that a warrant could not have been obtained in time***."  *Id.* (citation and internal quotation marks omitted) (emphasis added).  The "police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests."  *Welsh v. Wisconsin*, 466 U.S. 740, 749-50, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984).

Significantly, [t]here's no disputing that the [Supreme] Court considers the curtilage to stand on the same footing as the home itself for purposes of the Fourth Amendment."  *United States v. Pineda-Moreno*, 617 F.3d 1120, 1122 (9th Cir. 2010).  "When the warrantless search is to home or curtilage, we recognize two exceptions to the warrant requirement:  exigency and emergency."  *Sims v. Stanton*, 706 F.3d 954, 960 (9th Cir. 2013) ("[C]urtilage is protected to the same degree as the home . . . ."); *United States v. Perea-Rey*, 680 F.3d 1179, 1185 (9th Cir. 2012) ("Warrantless trespasses by the government into the home or its curtilage are Fourth Amendment searches." (citation omitted)).

### d.   *Exigent Circumstances*

"[W]arrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *United States v. Snipe*, 515 F.3d 947, 950 (9th Cir. 2008) (citation and internal quotation marks omitted). "It is clearly established Federal law that the warrantless search of a dwelling must be supported by probable cause and the existence of exigent circumstances." *Struckman*, 603 F.3d at 739 (citation and internal quotation marks omitted).

"[W]hen the government relies on the exigent circumstances exception [to the Fourth Amendment warrant requirement], it . . . must satisfy two requirements: first, the government must prove that the officer had probable cause to search the house; and second, the government must prove that exigent circumstances justified the warrantless intrusion." *Id.* (citations omitted).

### (i).   Probable Cause

"Generally, if a structure is divided into more than one occupancy unit, probable cause must exist for each unit to be searched." *Mena*, 226 F.3d at 1038 (citation omitted). "This rule, however, is not absolute. For example, we have held that a warrant is valid when it authorizes the search of a street address with several dwellings if the defendants are in control of the whole premises, if the dwellings are occupied in common, or if the entire property is suspect." *Id.* (citations omitted) (concluding that the officers had probable cause to search, at most, the suspect's room and one other room, in addition to the common areas, but not any of the other rooms); *see also United States v. Whitten*, 706 F.2d 1000, 1008 (9th Cir. 1983) ("[A] warrant may authorize a search of an entire street address while reciting probable cause as to only a portion of the premises if they are occupied in common rather than individually, if a multiunit building is used as a single entity, if the defendant was in control of the whole premises, or if the entire premises are suspect."); *United*

1  *States v. Whitney*, 633 F.2d 902, 907-08 (9th Cir. 1980) (discussing exceptions to

2  rule that "when the structure under suspicion is divided into more than one

3  occupancy unit, probable cause must exist for each unit to be searched."); *United*

4  *States v. Gilman*, 684 F.2d 616, 618 (9th Cir. 1982) ("Even if a warrant authorizes

5  the search of an entire premises containing multiple units while reciting probable

6  cause as to a portion of the premises only, it does not follow either that the warrant

7  is void or that the entire search is unlawful.").

8        Here, Sergeant Minster and Deputies Cox, Ramirez, Conley and Pederson

9  were proceeding based on the tip from a confidential informant – relayed by Deputy

10  Rissling at the debriefing/planning session behind the Albertson's – that a man he

11  believed to be Mr. O'Dell was riding a bicycle in front of the Hughes residence.

12  When the officers arrived at the Hughes residence, they observed a bicycle on the

13  front lawn.  While Deputies Conley and Pederson were to cover the back door of the

14  Hughes residence should Mr. O'Dell attempt to escape to the rear of the property,

15  they also were ordered to clear the rear of the property should Mr. O'Dell be hiding

16  somewhere thereabouts.  Nothing about the confidential informant's tip was specific

17  to the Hughes residence as opposed to the rear of the property, including the shack.

18        Therefore, the officers had probable cause to search for Mr. O'Dell inside the

19  Hughes residence, and Deputy Conley had probable cause to search for Mr. O'Dell

20  inside the shack.

21              **(ii).   Exigency**

22        "The exigent circumstances exception is premised on few in number and

23  carefully delineated circumstances, in which the exigencies of the situation make the

24  needs of law enforcement so compelling that the warrantless search is objectively

25  reasonable under the Fourth Amendment." *Id.* at 743 (citations and internal

26  quotation marks omitted).  "We have previously defined those situations as (1) the

27  need to prevent physical harm to the officers or other persons, (2) the need to

28  prevent the imminent destruction of relevant evidence, (3) the hot pursuit of a

1   fleeing suspect; and (4) the need to prevent the escape of a suspect." *Id.* (citations

2   omitted).  "Because the Fourth Amendment ultimately turns on the reasonableness

3   of the officer's actions in light of the totality of the circumstances, however, there is

4   no immutable list of exigent circumstances; they may include some other

5   consequence improperly frustrating legitimate law enforcement efforts." *Id.*

6   (citations and internal quotation marks omitted).  "The government bears the burden

7   of showing specific and articulable facts to justify the finding of exigent

8   circumstances." *Id.* (citation and internal quotation marks omitted).

9        In this case, an important predicate question is whether the Court should make

10   the determination of exigent circumstances with respect to the Hughes residence and

11   its curtilage or separately as to the shack itself.

12        *Cannon* holds that a search of a separate dwelling unit, even if within the

13   curtilage of the main residence, requires a separate warrant.  In this case, the shack

14   is akin to the Cook residential unit in *Cannon*.  Consequently, if Deputy Conley had

15   had a warrant to search the Hughes residence (and its curtilage), he nevertheless

16   would have needed a separate warrant to have searched the shack itself.  *See*

17   *Cannon*, 264 F.3d 875, 877-79 (separate dwelling required separate warrant).

18        Therefore, Deputy Conley must invoke a warrant exception as to the shack

19   itself, rather than as to the Hughes residence (and its curtilage).  As the Supreme

20   Court has made clear, the "most basic constitutional rule in this area is that searches

21   conducted outside the judicial process, without prior approval by judge or

22   magistrate, are per se unreasonable under the Fourth Amendment – subject only to a

23   few specifically established and well delineated exceptions." *Coolidge v. New*

24   *Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971) (citation

25   and internal quotation marks omitted).  "The exceptions are jealously and carefully

26   drawn, and there must be a showing by those who seek exemption . . . that the

27   exigencies of the situation made that course imperative.  [T]he burden is on those

28

1  seeking the exemption to show the need for it."  *Id.* (citation and internal quotation

2  marks omitted).

3          The determinative question, then, is whether there was exigency to search the

4  shack itself.  Specifically, the question is whether under the totality of the

5  circumstances it was reasonable – on account of exigency – for Deputy Conley to

6  search the shack itself without a warrant.

7          The question is not whether there was any exigency to search the Hughes

8  residence (and its curtilage).  Consequently, the Court reaches no conclusion as to

9  whether Sergeant Minster and Deputies Cox and Ramirez's warrantless search of

10  the Hughes residence was reasonable pursuant to the exigent circumstances

11  exception to the warrant requirement.

12          With respect to the shack itself, Defendants essentially argue that there was

13  exigency for the warrantless search to prevent Mr. O'Dell's possible escape and for

14  the safety of the five officers on the scene.  The shack had a single doorway.  If Mr.

15  O'Dell had been within the shack, he was trapped.  If Mr. O'Dell had been

16  elsewhere on the Hughes property, then there was no exigent reason to search the

17  shack.  Deputy Conley could have obtained a warrant "in time."

18          Likewise with respect to officer safety, if Mr. O'Dell was within the shack, he

19  was trapped.  There was no apparent threat to officer safety.  Tellingly, Deputy

20  Conley testified that, prior to opening the door to the shack, he did not feel

21  threatened.  If Mr. O'Dell had been elsewhere on the Hughes property, Defendants

22  have failed to show that a search of the shack was "imperative" to officer safety.

23  Moreover, the possibility that Mr. O'Dell was in the shack hiding but nobody else

24  would have been in the shack was premised on the unreasonable belief that the

25  shack was not a dwelling.

26          Defendants have failed to satisfy their burden in this regard.  Rather than

27  second-guess Deputy Conley's conduct with the benefit of the hindsight, the Court

28  concludes only that Defendants have failed to demonstrate "specific and articulable

31

facts" justifying a warrantless search of the shack based on any supposed exigency. Therefore, under the totality of the circumstances, the Court concludes that Deputy Conley's warrantless search was ***not*** reasonable pursuant to the exigent circumstances exception to the warrant requirement.

### e.   *Emergency Exception*

"The need to protect or preserve life or avoid serious injury is one such justification for what would be otherwise illegal absent an exigency or emergency." *Snipe*, 515 F.3d at 950-51 (citation and internal quotation marks omitted).  The Ninth Circuit has "adopt[ed] a two-pronged test that asks whether:  (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need."   *Id.* at 952.

Similarly, Defendants argue that the "immediate need to protect" the officers themselves presented an emergency justifying the warrantless search of the shack. For the same reasons discussed above, the Court disagrees.  There was no emergency to search the shack on the basis of officer safety, and Deputy Conley's search was therefore unreasonable.

Accordingly, Deputy Conley violated Mr. and Mrs. Mendez's constitutional right to free from an unreasonable search.

### f.   *Qualified Immunity*

Defendants argue that Deputy Conley is entitled to qualified immunity in this regard because he was following orders from his superior, Sergeant Minster.  But, "[c]ourts have widely held that a party's purported defense that he was 'just following orders' does not occup[y] a respected position in our jurisprudence." *Peralta v. Dillard*, 704 F.3d 1124, 1134 (9th Cir. 2013) (citations and internal quotation marks omitted).  "Instead, officials have an obligation to follow the Constitution even in the midst of a contrary directive from a superior or in a policy."

1  *Id.* (citation and internal quotation marks omitted); *Dirks v. Grasso*, 449 F. App'x

2  589, 592 (9th Cir. 2011) ("[The defendants] cite no binding authority holding that

3  following a superior's orders entitles officers to qualified immunity, and none

4  exists.").

5       Preliminarily, it is not clear that Sergeant Minster ordered Deputy Conley (or

6  Deputy Pederson) to search the shack.  Regardless, the question is whether a

7  reasonable officer could have believed that Deputy Conley's conduct was lawful.

8       Deputy Conley had information that people lived in the rear of the Hughes

9  property.  In addition, as discussed above, Deputy Conley observed (or should have

10  observed) a number of objective indicia demonstrating that the shack was a separate

11  dwelling unit.  Moreover, Deputy Conley did not have a warrant to search the shack.

12  And, under the totality of the circumstances, no reasonable officer could have

13  believed that a warrantless search of the shack was justified under the exigency or

14  emergency exceptions.

15       Rather, Deputy Conley opened the door (and pulled back the blanket) to a

16  dwelling in which he knew – or should have known – people lived.  Although

17  Deputy Conley was searching for a parolee-at-large, the shack had a single doorway.

18  If Mr. O'Dell had been within the shack, he would have been trapped.  He could not

19  have escaped.  Regardless of whether Mr. O'Dell was within the shack, there was no

20  apparent threat to officer safety.  Deputy Conley himself did not feel threatened

21  prior to opening the door to the shack.

22       Finally, Sergeant Minster did not tell the Deputies that the shack was not

23  inhabited and did not specifically order them not to provide knock-notice (discussed

24  below).

25       Every reasonable officer in Deputy Conley's position would have understood

26  that what he was doing violated Mr. and Mrs. Mendez's right to be free from an

27  unreasonable search.  Accordingly, Mr. and Mrs. Mendez's right to be free from an

28  unreasonable search was clearly established in this case.

4.        **Manner of Entry**

a.        ***Knock-Notice***

"The common-law principle that law enforcement officers must announce their presence and provide residents an opportunity to open the door is an ancient one." *Hudson v. Michigan*, 547 U.S. 586, 589, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006) (citation omitted).  "Since 1917, when Congress passed the Espionage Act, this traditional protection has been part of federal statutory law and is currently codified at 18 U.S.C. § 3109." *Id.* (citation omitted).  Finally, in *Wilson v. Arkansas*, 514 U.S. 927, 115 S. Ct. 1914, 131 L. Ed. 2d 976 (1995), the United States Supreme Court concluded that the "rule was also a command of the Fourth Amendment." *Id.* (citation omitted).

"The requirements of [the federal knock-and-announce statute ] have been held to cover warrantless searches and entries of a home to make an arrest." William E. Ringel, *Searches and Seizures, Arrests and Confessions* § 6:7 n.2 (2d ed. 2013) (citing cases) (citing *United States v. Flores*, 540 F.2d 432, 436 (9th Cir. 1976) ("[A] warrantless entry normally requires the officer to give notice of his authority and purpose before using force to enter.")).  Furthermore, the federal knock-and-announce statute requirements have been incorporated into the Fourth Amendment.  *United States v. Valenzuela*, 596 F.2d 824, 830 (9th Cir. 1979).

As the Ninth Circuit has explained,

> The general practice of physically knocking on the door, announcing law enforcement's presence and purpose, and receiving an actual refusal or waiting a sufficient amount of time to infer refusal is the preferred method of entry.  This method is preferable because it provides a clear rule that law enforcement can follow.  It also promotes the goals of the knock and announce principle:  protecting the sanctity of the home, preventing the unnecessary destruction of private property through forced entry, and avoiding violent confrontations that may occur if occupants of the home mistake law enforcement for intruders.

*United States v. Combs*, 394 F.3d 739, 744 (9th Cir. 2005) (citations omitted);

*Richards v. Wisconsin*, 520 U.S. 385, 387, 117 S. Ct. 1416, 137 L. Ed. 2d 615

1 (1997) ("[T]he Fourth Amendment incorporates the common law requirement that

2 police officers entering a dwelling must knock on the door and announce their

3 identity and purpose before attempting forcible entry.").

4      There is no dispute that Sergeant Minster and Deputies Cox and Ramirez

5 complied with the knock-notice requirement as to the Hughes residence.  Here,

6 however, the question is whether Deputies Conley and Pederson were required to

7 knock-and-announce at the door of the shack itself.

8      As a general rule, law enforcement officers "are not required to [knock and

9 announce] at each additional point of entry into structures within the curtilage."

10 *United States v. Villanueva Magallon*, 43 F. App'x 16, 18 (9th Cir. 2002) (citations

11 omitted); *see also United States v. Crawford*, 657 F.2d 1041, 1044 (9th Cir. 1981)

12 ("There are no decisions directly on point dealing with [whether], after having

13 complied with the dictates of [the federal knock-and-announce statute] at the front

14 door, the arresting officers were then required to comply with [the statute] at the

15 inner bedroom door.  The Ninth Circuit has consistently held that where the first or

16 contemporaneous entry is lawful under [the statute], a defendant cannot complain of

17 the unlawfulness of subsequent entries.").

18      For example, the Ninth Circuit has "assumed for purposes of the [statutory]

19 knock-and-announce rule . . . that a garage is part of a house."  *United State v.

20 Frazin*, 780 F.2d 1461, 1467 n. 6 (9th Cir. 1986); *Valenzuela*, 596 F.2d at 1365

21 ("[T]he garage entry was made only after the proper entry at the residence, and

22 officers are not required to announce at [e]very place of entry; one proper

23 announcement under [the federal knock-and-announce statute] is sufficient."

24 (citation and internal quotation marks omitted)).

25      *Villanueva Magallon*, 43 F. App'x 16, is instructive.  In that case, the

26 government had a warrant to search the premises at 792 Ada Street, Chula Vista,

27 California ("792").  Another garage and house were on the same property – 784 Ada

28 Street, Chula Vista, California ("784").  Law enforcement officers entered both 792

1  and 784 and discovered drugs in the latter.  *Id.* at 17.  The Ninth Circuit rejected the

2  defendant's argument that, "even if the warrant was valid, the agents did not knock

3  and announce before they entered 784," remarking, "This boots him nothing,"

4  because it was "undisputed that the agents did knock and announce at 792."  *Id.* at

5  18.

6           However, the Ninth Circuit also observed that, "[a]t any rate, nobody was in

7  the house at 784, so [the defendant] cannot show any detriment from th[e] failure"

8  to knock and announce before entering 784."  *Id.*  More importantly, the Ninth

9  Circuit concluded that the defendant "possessed and controlled both 792 and 784

10  and, ***in fact, 784 was not being used as a separate residence by some third,***

11  ***innocent party***."  *Id.* at 17-18 (emphasis added) ("From the record, it is clear that

12  784 was within the curtilage of 792.").

13           Here, as discussed above, Deputies Conley and Pederson knew (or should

14  have known) that the shack was a separate residence being used by third parties –

15  *i.e.*, not Ms. Hughes.  Deputies Conley and Pederson, however, did not knock-and-

16  announce at the shack.  Under *Cannon* and *Villanueva Magallon*, Deputies Conley

17  and Pederson were required to knock-and-announce their presence at the door of the

18  shack itself.

19           **b.**      ***No-Knock Entry Exceptions***

20           The "common-law 'knock and announce' principle forms a part of the

21  reasonableness inquiry under the Fourth Amendment."  *Wilson*, 514 U.S. at 929

22  ("[T]he method of an officer's entry into a dwelling [i]s among the factors to be

23  considered in assessing the reasonableness of a search or seizure.").

24           "This is not to say, of course, that every entry must be preceded by an

25  announcement.  The Fourth Amendment's flexible requirement of reasonableness

26  should not be read to mandate a rigid rule of announcement that ignores

27  countervailing law enforcement interests."  *Id.* at 934 ("[T]he common-law principle

28

36

1   of announcement was never stated as an inflexible rule requiring announcement

2   under all circumstances.").

3       "*Wilson* and cases following it have noted the many situations in which it is

4   not necessary to knock and announce." *Hudson*, 547 U.S. at 589 "It is not

5   necessary when circumstances presen[t] a threat of physical violence, or if there is

6   reason to believe that evidence would likely be destroyed if advance notice were

7   given, or if knocking and announcing would be futile." *Id.* at 589-90 (citations and

8   internal quotation marks omitted). "We require only that police have a reasonable

9   suspicion . . . under the particular circumstances that one of these grounds for failing

10  to knock and announce exists, and we have acknowledged that [t]his showing is not

11  high." *Id.* at 590 (citation and internal quotation marks omitted) ("When the knock-

12  and-announce rule does apply, it is not easy to determine precisely what officers

13  must do.").

14      "In order to justify a 'no-knock' entry, the police must have a reasonable

15  suspicion that knocking and announcing their presence, under the particular

16  circumstances, would be dangerous or futile, or that it would inhibit the effective

17  investigation of the crime by, for example, allowing the destruction of evidence."

18  *Richards*, 520 U.S. at 394. "This standard – as opposed to a probable-cause

19  requirement – strikes the appropriate balance between the legitimate law

20  enforcement concerns at issue in the execution of search warrants and the individual

21  privacy interests affected by no-knock entries." *Id.* (citations omitted). "This

22  showing is not high, but the police should be required to make it whenever the

23  reasonableness of a no-knock entry is challenged." *Id.* at 394-95.

24      In this context, however, the Supreme Court has "treated reasonableness as a

25  function of the facts of cases so various that no template is likely to produce sounder

26  results than examining the totality of circumstances in a given case; it is too hard to

27  invent categories without giving short shrift to details that turn out to be important in

28

1  a given instance, and without inflating marginal ones." *United States v. Banks*, 540
2  U.S. 31, 35, 124 S. Ct. 521, 157 L. Ed. 2d 343 (2003).

3    Moreover, where the "police claim exigent need to enter," the "crucial fact in
4  examining their actions" is the "particular exigency claimed." *Id.* at 39.

5    The analysis here is similar to that above with respect to exigency/emergency.
6  Defendants again argue that a no-knock entry was justified on the bases of effective
7  apprehension of Mr. O'Dell and officer safety. But the shack had only a single
8  doorway – anyone inside was trapped. And Deputy Conley testified that, prior to
9  opening the door to the shack, he did not feel threatened – there was no apparent
10 danger. If Mr. O'Dell was not within the shack, then there was no exigency for a
11 no-knock entry.

12    Under the totality of the circumstances of this case, Defendants failed to
13 introduce sufficient evidence that Deputies Conley and Pederson had a reasonable
14 suspicion that knocking-and-announcing would have been dangerous or futile, or
15 that it would have inhibited the effective apprehension of Mr. O'Dell. Given that
16 the knock-and-announce requirement is part of the Fourth Amendment
17 reasonableness inquiry, the Court cannot say that the failure to knock-and-announce
18 in this case was reasonable.

19    Accordingly, Deputies Conley and Pederson violated Mr. and Mrs. Mendez's
20 constitutional right to free from an unreasonable search based on the manner of
21 entry.

22        **c.    *Qualified Immunity***

23    Again, the determinative question is whether a reasonable officer could have
24 believed that the conduct of Deputies Conley and Pederson was lawful. As
25 discussed above, Deputies Conley and Pederson knew (or should have known) that
26 the shack was a separate dwelling unit. Accordingly, a reasonable officer would
27 have recognized the need to knock-and-announce his presence before searching the
28 shack. Nor would a reasonable officer have believed that knocking-and-announcing

1   would have been dangerous (Deputy Conley himself did not feel threatened before
2   opening the shack door) or futile or would have inhibited effective apprehension of
3   Mr. O'Dell (anyone inside could not have escaped).  Indeed, Sergeant Minster
4   recognized the need to provide knock-notice before a search of the main Hughes
5   residence.

6       Every reasonable officer in Deputies Conley and Pederson's position would
7   have understood that what they were doing violated that right.  Accordingly, Mr.
8   and Mrs. Mendez's right to be free from an unreasonable search – in the absence of
9   Deputies Conley and Pederson's having knocked-and-announced their presence and
10   provided Mr. and Mrs. Mendez with an opportunity to open the door to the shack –
11   was clearly established in this case.

12   **C.   FOURTH AMENDMENT:  EXCESSIVE FORCE (AT THE MOMENT OF SHOOTING)**

14   **1.   <u>Constitutional Violation</u>**

15   Mr. and Mrs. Mendez next argue that Deputies Conley and Pederson violated
16   their Fourth Amendment right to be free from excessive force:

17       Determining whether the force used to effect a particular seizure is
     "reasonable" under the Fourth Amendment requires a careful balancing
18       of "'the nature and quality of the intrusion on the individual's Fourth
     Amendment interests'" against the countervailing governmental interests
19       at stake.  Our Fourth Amendment jurisprudence has long recognized that
     the right to make an arrest or investigatory stop necessarily carries with it
20       the right to use some degree of physical coercion or threat thereof to
     effect it.  Because "[t]he test of reasonableness under the Fourth
21       Amendment is not capable of precise definition or mechanical
     application," however, its proper application requires careful attention to
22       the facts and circumstances of each particular case, including the severity
     of the crime at issue, whether the suspect poses an immediate threat to
23       the safety of the officers or others, and whether he is actively resisting
     arrest or attempting to evade arrest by flight.
24

25   *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)
26   (citations omitted).

27

28

1   As recently elaborated by the Ninth Circuit, the *Graham* factors (which are
2   incorporated into the applicable Model Jury Instruction 9.22) "are not exclusive and
3   we must consider the totality of the circumstances." *Gonzalez v. City of Anaheim*, --
4   F.3d --, 2013 WL 1943326, at *2 (9th Cir. May 13, 2013).  The second *Graham*
5   factor, immediacy of the threat posed to other officers or civilians, is characterized
6   as the most important factor.  *Id.* at *3.

7   Courts are directed to give "careful attention to the facts and circumstances of
8   each particular case" noting that "[t]he 'reasonableness' of a particular use of force
9   must be judged from the perspective of a reasonable officer on the scene, rather than
10  with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citation omitted).
11  Furthermore, "[t]he calculus of reasonableness must embody allowance for the fact
12  that police officers are often forced to make split-second judgments – in
13  circumstances that are tense, uncertain, and rapidly evolving – about the amount of
14  force that is necessary in a particular situation." *Id.* at 396-97.

15  The reasonableness inquiry is therefore highly fact specific and objective.
16  *See Scott v. Harris*, 550 U.S. 372, 383, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)
17  ("Although respondent's attempt to craft an easy-to-apply legal test in the Fourth
18  Amendment context is admirable, in the end we must still slosh our way through the
19  factbound morass of 'reasonableness.'").  "A reasonable use of deadly force
20  encompasses a range of conduct, and the availability of a less-intrusive alternative
21  will not render conduct unreasonable." *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th
22  Cir. 2010) (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

23  For example, in *Garcia v. Santa Clara County*, No. C 02-04360 RMW, 2004
24  WL 2203560 (N.D. Cal. Sept. 29, 2004), it was undisputed that defendant Deputy
25  Dawson shot and killed the decedent (Mr. Garcia).  *Id.* at *4.  The district court
26  granted the defendants' motion for summary judgment, concluding that "Dawson's
27  use of deadly force was objectively reasonable" and therefore that "no constitutional
28  violation occurred." *Id.* at *8.  The evidence in that case established that "Dawson

40

1    had probable cause to believe that Garcia posed a significant threat of death or

2    serious physical injury to Dawson." *Id.* at *6.  "First, Dawson observed that Garcia

3    was in possession of a firearm.  Second, Dawson saw Garcia pick up the gun, and

4    begin to twist backwards towards Dawson, and move his arm holding the gun in

5    Dawson's direction.  Third, the events occurred during a foot pursuit in which

6    Garcia was attempting to escape." *Id.*

7          Mr. and Mrs. Mendez do not dispute that Deputies Conley and Pederson's use

8    of deadly force – at the moment of shooting – was objectively unreasonable under

9    the totality of the circumstances.  Indeed, in their closing argument, counsel for Mr.

10   and Mrs. Mendez conceded that (again, at the time Deputy Conley opened the shack

11   door) Deputies Conley and Pederson's use of force was reasonable given their belief

12   that a man was holding a firearm rifle threatening their lives.

13         Mr. and Mrs. Mendez instead argue that Deputies Conley and Pederson

14   violated the Fourth Amendment because they "created" the incident that led to the

15   shooting.  That argument is discussed below.

16         **2.      Qualified Immunity**

17         Because Mr. and Mrs. Mendez have failed to prove a violation of their

18   constitutional right to be free from excessive force in this regard, the Court need not

19   reach the question of qualified immunity.

20   **D.     FOURTH AMENDMENT:  EXCESSIVE FORCE (PROVOCATION)**

21         Mr. and Mrs. Mendez's excessive force claim, indeed their entire theory of

22   the case, is premised upon the law of Fourth Amendment provocation.  In the Ninth

23   Circuit, "***where an officer intentionally or recklessly provokes a violent***

24   ***confrontation, if the provocation is an independent Fourth Amendment violation,***

25   ***he may be held liable for his otherwise defensive use of deadly force***."  *Billington*

26   *v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002) (emphasis added); *Alexander v. City*

27   *of San Francisco*, 29 F.3d 1355, 1366 (9th Cir. 1994) ("[The] plaintiff argues that

28

41

defendants used excessive force in creating the situation which caused [the decedent] to take the actions he did.").

The Ninth Circuit has explained this rule as follows:

> In *Alexander*, the officers allegedly used excessive force because they committed an independent Fourth Amendment violation by entering the man's house to arrest him without an arrest warrant, for a relatively trivial and non-violent offense, and this violation provoked the man to shoot at the officers. Thus, even though the officers reasonably fired back in self-defense, they could still be held liable for using excessive force because their ***reckless and unconstitutional provocation*** created the need to use force.
>
> . . .
>
> *Alexander* must be read consistently with the Supreme Court's admonition in *Graham v. Connor* that courts must judge the "reasonableness of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." That goes for the events leading up to the shooting as well as the shooting. Our precedents do not forbid any consideration of events leading up to a shooting. But neither do they permit a plaintiff to establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided.
>
> . . .
>
> But if, as in *Alexander*, an officer intentionally or recklessly provokes a violent response, and the provocation is an independent constitutional violation, that provocation may render the officer's otherwise reasonable defensive use of force unreasonable as a matter of law. ***In such a case, the officer's initial unconstitutional provocation, which arises from intentional or reckless conduct rather than mere negligence, would proximately cause the subsequent application of deadly force.***

*Billington*, 292 F.3d at 1189-91 (citations omitted) (emphasis added).

Reductively, an officer's otherwise reasonable (and lawful) defensive use of force is unreasonable as a matter of law, if (1) the officer intentionally or recklessly provoked a violent response, and (2) that provocation is an independent constitutional violation.

42

1.    **Predicate Constitutional Violation:  Unreasonable Search**

For example, in *Federman v. County of Kern*, 61 F. App'x 438 (9th Cir. 2003), the Ninth Circuit concluded that the defendants' illegal entry was (1) a constitutional violation, (2) reckless, and (3) not protected by qualified immunity. Specifically,

> [the] plaintiffs ha[d] alleged constitutional violations:  the threshold inquiry under *Saucier*.  The Sheriff department's alleged reckless entry of [the decedent]'s home with a SWAT team constitutes excessive force under the Fourth Amendment.  This aggressive entry without warning or a warrant, to detain [the decedent] for psychiatric examination due to his odd but relatively trivial, non-criminal behavior, provoked [the decedent] to resist and turned a relatively minor situation into a fatal shooting.  No reasonable police officer could have believed that he was entitled to make such an entry.

*Id.* at 440 (citation omitted) (affirming, on interlocutory appeal, the district court's judgment denying qualified immunity to the individual defendants on the plaintiffs' excessive force claims).

Similarly, *Espinosa v. City of San Francisco*, 598 F.3d 528 (9th Cir. 2010), involved an illegal entry.  *Id.* at 533.  The Ninth Circuit concluded that the district court "properly denied defendants' summary judgment motion on whether the officers were entitled to qualified immunity for allegedly violating [the decedent]'s Fourth Amendment rights by intentionally or recklessly provoking a confrontation." *Id.* at 538.  The Ninth Circuit concluded that, "[v]iewing the evidence in the light most favorable to the plaintiffs, there is evidence that the illegal entry ***created a situation*** which led to the shooting and required the officers to use force that might have otherwise been reasonable."  *Id.* at 539 (emphasis added) (citing *Alexander*) ("If an officer intentionally or recklessly violates a suspect's constitutional rights, then the violation may be a provocation creating a situation in which force was necessary and such force would have been legal but for the initial violation.").

As discussed above, Deputy Conley violated Mr. and Mrs. Mendez's Fourth Amendment right to be free from an unreasonable search in searching the shack

without a warrant (or applicable warrant exception).  Deputies Conley and Pederson violated Mr. and Mrs. Mendez's Fourth Amendment right to be free from an unreasonable search in and in failing to knock-and-announce before the search.  As a result, Mr. Mendez picked up the BB gun rifle while sitting up on the futon within the shack, and Deputies Conley and Pederson fired their guns.

Under *Billington*, Deputies Conley and Pederson's predicate constitutional violations "provoked" Mr. Mendez's response, which in turn resulted in Deputies Conley and Pederson's subsequent use of force.

### 2.    Intentional or Reckless Provocation

Mr. and Mrs. Mendez do not argue that Deputy Conley or, for that matter, Deputy Pederson intentionally provoked the violent response from Mr. Mendez.

With respect to "reckless" provocation, the Ninth Circuit in *Billington* stated, "We read *Alexander*, as limited by [*Duran v. City of Maywood*, 221 F.3d 1127 (9th Cir. 2000)], to hold that where an officer intentionally or ***recklessly*** provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force." 292 F.3d at 1189 (emphasis added).  However, the Ninth Circuit's opinion in *Alexander* does not use the word "reckless" or any derivative thereof.  *See* 29 F.3d 1355.

Furthermore, the Ninth Circuit's opinion in *Duran* uses the word "reckless" (and any derivative thereof) only once:

> The Plaintiffs' first argument is that the district court erred when it refused to give an *Alexander* instruction.  This instruction is based on the case of [*Alexander*], and applies when there is evidence that a police officer's use of excessive and unreasonable force caused an escalation of events that led to the plaintiff's injury.  Here, the Plaintiffs claim that this instruction should have been given because the manner in which the two officers approached the Duran residence "virtually assured a police shooting."  Specifically, they point to the fact that the officers walked up the driveway with their guns drawn and never announced their presence.  The Plaintiffs claim that this "stealth" approach "raised the likelihood" that "whomever they surprised would point a gun at them."

Accordingly, they argue the district court erred when it refused to give the *Alexander* instruction. . . .

> Plaintiffs proposed instruction reads as follows: "If you find that [the defendant officer] ***recklessly***, intentionally and/or unreasonably created a situation where the accidental or purposeful use of deadly force upon [the decedent] would become likely, such conduct would be a violation of [the decedent]'s Fourth Amendment right to be free from unreasonable seizures."

221 F.3d at 1130-31 & n.1 (emphasis added).  Instead, the Ninth Circuit explained the relevant standard as follows:

> In order to justify an *Alexander* instruction, ***there must be evidence to show that the officer's actions were excessive and unreasonable***, and that these actions caused an escalation that led to the shooting.  Here, no such facts exist.  The two uniformed officers simply walked up a driveway silently with their guns drawn.  Contrary to the Plaintiffs' assertions, nothing about these actions should have provoked an armed response.  As a result, the district court did not abuse its discretion in denying the Plaintiffs' request to give an *Alexander* instruction.

*Id.* at 1131 (emphasis added).

Returning to the Ninth Circuit's opinion in *Billington*,

> *Alexander*'s requirement that the provocation be either intentional or ***reckless*** must be kept within ***the Fourth Amendment's objective reasonableness standard***.  The basis of liability for the subsequent use of force is the initial constitutional violation, which must be established under ***the Fourth Amendment's reasonableness standard***.  Thus, if a police officer's conduct provokes a violent response, as in *Duran*, but is ***objectively reasonable under the Fourth Amendment***, the officer cannot be held liable for the consequences of that provocation regardless of the officer's subjective intent or motive.  But if an officer's provocative actions are ***objectively unreasonable under the Fourth Amendment***, as in *Alexander*, liability is established, and the question becomes the scope of liability, or what harms the constitutional violation proximately caused.

> . . .

> Under *Alexander*, the fact that an officer ***negligently*** gets himself into a dangerous situation will not make it unreasonable for him to use force to defend himself.  ***The Fourth Amendment's "reasonableness" standard is not the same as the standard of "reasonable care" under tort law, and negligent acts do not incur constitutional liability.  An***

> ***officer may fail to exercise "reasonable care" as a matter of tort law yet still be a constitutionally "reasonable" officer.*** Thus, even if an officer ***negligently*** provokes a violent response, that ***negligent*** act will not transform an otherwise reasonable subsequent use of force into a Fourth Amendment violation.

292 F.3d at 1190 (emphasis added).

Therefore, for purposes of *Billington* provocation, the Ninth Circuit equates "reckless" (and intentional) conduct with conduct that is ***unreasonable under the Fourth Amendment***. In this regard, such "reckless" conduct is distinguished from "bad tactics" and conduct that is merely negligent as a matter of tort law.

For liability to attach under *Billington*, such "reckless" conduct need only be unreasonable under the Fourth Amendment. Specifically, "reckless" conduct for purposes of *Billington* provocation need not be "reckless" as a matter of tort law, so long as it is unreasonable under the Fourth Amendment. *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 2 ("A person acts recklessly in engaging in conduct if: (a) the person knows of the risk of harm created by the conduct or knows facts that make the risk obvious to another in the person's situation, and (b) the precaution that would eliminate or reduce the risk involves burdens that are so slight relative to the magnitude of the risk as to render the person's failure to adopt the precaution a demonstration of the person's indifference to the risk.").

The Ninth Circuit's opinion in *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011), confirms this understanding of the rule. In *Glenn*, the police confronted the decedent outside of his home. *Id.* at 867-68. An officer fired several beanbag rounds from a shotgun, which struck the decedent. *Id.* at 869. After the decedent was hit with the beanbag rounds, he began moving toward the house. *Id.* Because the decedent's parents were inside the house (and potentially threatened by the movement), two other officers then fired their semiautomatic weapons, killing the decedent. *Id.*

46

After quoting the general rule from *Billington* ("[W]here an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force."), the Ninth Circuit concluded as follows:

> Because there is a triable issue of whether shooting [the decedent] with the beanbag shotgun was itself excessive force, under *Billington* there is also a question regarding the subsequent use of deadly force. Even assuming, as the district court concluded, that deadly force was a reasonable response to [the decedent's] movement toward the house, a jury could find that the beanbag shots provoked [the decedent's] movement and thereby precipitated the use of lethal force. **If jurors conclude that the provocation – the use of the beanbag shotgun – was an independent Fourth Amendment violation, the officers "may be held liable for [their] otherwise defensive use of deadly force."**

*Id.* at 879 (citing *Billington*) (emphasis added) (reversing the district's ruling on summary judgment that the officers' use of force did not violate the decedent's Fourth Amendment rights).

In *Glenn*, the determinative question under *Billington* clearly was only whether there had been a predicate violation of the Fourth Amendment. Notwithstanding the general rule statement, the Ninth Circuit did not require a separate showing that the officers' conduct was "reckless" as a matter of tort law, or in any way other than under the Fourth Amendment's reasonableness standard.

Consequently, the Court need not conclude that Deputies Conley and Pederson's predicate constitutional violations were "reckless" as a matter of tort law (or otherwise). Under *Billington* and its progeny, it is sufficient that this conduct was unreasonable under the Fourth Amendment and provoked a violent confrontation in which Deputies Conley and Pederson used deadly force.

Defendants argue that "there is no liability under *Alexander* where defendants' conduct was *undeserving* of a violent response." (Docket No. 242 at 3 (emphasis in original)). But the Ninth Circuit has indicated that the predicate constitutional violation (here, illegal entry) need not be menacing or "provocative"

47

in the sense of inciting a violent response.  Rather, for purposes of *Billington/Alexander* provocation, it is sufficient that the predicate constitutional violation "created the need to use force" (*Billington*) or "created a situation which led to the shooting" (*Espinosa*).

*Glenn*, 673 F.3d 864, is in accord.  In that case, the defendant officers did not act "provocatively" or menacingly or in a way that necessarily "deserved" a violent response.  Indeed, the decedent did not react violently.  Yet the Ninth Circuit concluded that the theory of *Billington/Alexander* provocation applied based on the (potential) predicate excessive force violation.

Nor is Defendants' reliance on *Duran*, 221 F.3d 1127, persuasive in this regard.  In *Duran*, the Ninth Circuit provided the following background:

> At approximately 6:30 a.m., on August 15, 1994, Officer Curiel and Officer William Wallace responded to a dispatch call regarding loud music and shots fired in the vicinity of 52nd and Carmelita Street in the City of Maywood.  When the officers arrived at the location, they heard music coming from inside the Duran's garage.  The officers pulled out their firearms and silently walked up the driveway toward the source of the music.

> As they approached, the officers heard the sound of a person racking a pistol.  Immediately upon hearing this sound, Officer Wallace yelled to his partner, "He just racked one."  At the same moment, Officer Curiel saw Eloy Duran emerge from behind a pickup truck in the garage holding a weapon.  Officer Curiel testified that he shouted in Spanish, "Police, drop the gun," but Duran ignored Officer Curiel's command and pointed his weapon at the officers.  Officer Curiel then fired four shots at Duran, causing him to fall to the floor.  When Office Curiel approached Duran to disarm him, Duran pointed the gun at him.  Officer Curiel stated that he shouted loudly, "Don't, don't, don't."  When Duran failed to respond, Officer Curiel fired two more rounds into Duran's chest.  At this point, Duran stopped moving and Officer Curiel removed the gun.

*Id.* at 1129-30 ("In order to justify an *Alexander* instruction, there must be evidence to show that the officer's actions were excessive and unreasonable, and that these actions caused an escalation that led to the shooting.").

On the *Alexander* issue, the Ninth Circuit stated as follows:

> Contrary to the Plaintiffs' assertions, the officers did not make a "stealth" approach.  Officer Curiel testified that he and Officer Wallace arrived at the scene in marked police cars and that both men were wearing police uniforms.  They testified further that he and Wallace met on the sidewalk in front of the Duran's residence and walked, side-by-side, up the driveway toward the music in the garage.   Although Plaintiffs are correct in pointing out that the officers had their guns drawn and did not announce their presence, these actions were entirely reasonable given that they were responding to a call that shots had been fired.

*Id.* at 1131 (concluding that the "district court did not abuse its discretion in denying the Plaintiffs' request to give an *Alexander* instruction.").

Arguably, this reasoning could be read to indicate that the district court rightly denied the *Alexander* instruction because the officers' conduct was "undeserving" of a violent – *i.e.*, not menacing or incitingly provocative – and therefore not "excessive" or "unreasonable" or "intentional or reckless" under *Alexander*.

However, the Court understands this reasoning to indicate that the district court rightly denied the *Alexander* instruction because there was no evidence of a predicate constitutional violation – *i.e.*, the officers' conduct was reasonable under the Fourth Amendment and therefore not "excessive" or "unreasonable" or "intentional or reckless" under *Alexander*.

Similarly, *Duran* can be distinguished on its facts.  For example, in this case, with respect to the shack if not the Hughes residence, Deputies Conley and Pederson arguably did make a "stealth" approach.

Defendants also argue that there was no violent confrontation based on Plaintiffs' own theory of the case (*i.e.*, Mr. Mendez simply was moving the BB run to sit up).  Again, *Glenn* suggests otherwise – the decedent in that case did not react violently or in a confrontational manner.

Accordingly, Deputies Conley and Pederson violated Mr. and Mrs. Mendez's right to be free from excessive force under a theory of *Billington* provocation. The predicate (unreasonable search) constitutional violations render their "otherwise reasonable defensive use of force unreasonable as a matter of law."

The Court recognizes that Deputy Pederson did not technically search the shack, as discussed above. Nevertheless, the Court concludes that Deputy Pederson is liable under *Billington* for two reasons. **First**, there is no indication in the case law that only the officer who commits the predicate constitutional violation should be held liable for the subsequent use of deadly force. Tellingly, in *Glenn*, one officer shot the decedent with the beanbag rounds (the predicate violation), and two different officers killed the decedent (the subsequent use of deadly force).

**Second**, as discussed above, Deputy Pederson (as well as Deputy Conley) violated Mr. and Mrs. Mendez's right to be free from an unreasonable search in the absence of a proper knock-and-announce – itself a predicate constitutional violation that directly provoked the violent confrontation and subsequent use of deadly force. If the Deputies had announced themselves, then this tragedy would never have occurred.

**Third,** even if "reckless" were construed in its traditional tort sense and "undeserved" meant what Defendants contend, the Court's ruling would be the same. As discussed below, the multiple indicia of residency – including being told that someone lived on the property – means that the conduct rose beyond even gross negligence. And it is inevitable that a startling armed intrusion into the bedroom of an innocent third party, with no warrant or notice, will incite an armed response. Any other ruling would be inconsistent with the Second Amendment, as discussed below.

### 3.   <u>Qualified Immunity</u>

Again, the question is whether a reasonable officer could have believed that the conduct of Deputies Conley and Pederson was lawful. As in *Federman* and

50

*Espinosa*, Deputies Conley and Pederson's unreasonable search and manner of entry constituted the predicate, provocative constitutional violation that renders their subsequent use of force unreasonable as a matter of law.  For the reasons discussed above, all of Mr. and Mrs. Mendez's rights in this regard were clearly established. Every reasonable officer in Deputies Conley and Pederson's position would have understood that what they were doing violated those rights.

In particular, both during trial and in the briefs following testimony, Deputies Conley and Pederson claim their actions were reasonable because they reasonably did not perceive the shack to be inhabited or, indeed, habitable.  Based on the Court's Findings of Fact, their perception was unreasonable.  Had this mistake of fact been reasonable, then there would have been no liability.

### 4.    Actual and Proximate Causation

A plaintiff must prove that the defendant's "actions were both the actual and the proximate cause" of the plaintiff's injury.  *White v. Roper*, 901 F.2d 1501, 1506 (9th Cir. 1990); *see Billington*, 292 F.3d at 1190 ("[I]f an officer's provocative actions are objectively unreasonable under the Fourth Amendment, as in *Alexander*, liability is established, and ***the question becomes the scope of liability, or what harms the constitutional violation proximately caused***." (emphasis added)).

A defendant's conduct is an actual cause of the plaintiff's injury "only if the injury would not have occurred 'but for' that conduct.  *White*, 901 F.2d at 1506 (citation omitted).  Mr. and Mrs. Mendez would not have been injured but for Deputies Conley and Pederson's intrusion into the shack.  Therefore, the conduct of Deputies Conley and Pederson was an actual cause of Mr. and Mrs. Mendez's injuries.

Furthermore, the "requirement of actual cause is a 'rule of exclusion.'  Once it is established that the defendant's conduct has in fact been one of the causes of the plaintiff's injury, there remains the question whether the defendant should be legally

1  responsible for the injury." *Id.* (citation and internal quotation marks omitted).

2  "This question is generally referred to as one of proximate cause." *Id.*

3       A defendant's conduct is not a proximate cause of the plaintiff's injury "if

4  another cause intervenes and supersedes his liability for the subsequent events." *Id.*

5  (citation omitted).  Importantly, whether a plaintiff's own conduct, as an intervening

6  cause of his injury, supersedes the defendant's liability for the results of his own

7  conduct "depends upon what was reasonably foreseeable to [the defendant] at the

8  time." *Id.*

9       "The courts are quite generally agreed that [foreseeable] intervening causes . .

10  . will not supersede the defendant's responsibility." *Id.* (citation and internal

11  quotation marks omitted).  "Courts look to the original foreseeable risk that the

12  defendant created.  When one person's conduct threatens another, the normal efforts

13  of the other . . . to avert the threatened harm are not a superseding cause of harm

14  resulting from such efforts, so as to prevent the first person from being liable for that

15  harm." *Id.* (citations and internal quotation marks omitted).

16       Here, Justice Jackson's concurring opinion in *McDonald v. United States*, 335

17  U.S. 451, 69 S. Ct. 191, 93 L. Ed. 153 (1948), is informative.  In *McDonald*, the

18  defendant rented a room in a residence that the landlady operated as a rooming

19  house.  *Id.* at 452.  The defendant had been under police surveillance based on

20  suspicion that he was running a "numbers game."  *Id.*  On the day of the defendant's

21  arrest three police officers surrounded the house during the midafternoon.  The

22  officers did not have a warrant for arrest nor a search warrant.  One of the officers

23  thought that he heard an adding machine, which frequently was used in numbers

24  games.  *Id.*  Believing that the numbers game was in process, one of the officers

25  opened a window leading into the landlady's room and climbed through.  *Id.* at 452-

26  53.  He identified himself and then let the other officers into the house.  *Id.* at 453.

27  The officers arrested the defendant in an end bedroom on the second floor.  *Id.*

28

According to Justice Jackson,

When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant.

. . . the method of enforcing the law exemplified by this search is one which not only violates legal rights of defendant but is certain to involve the police in grave troubles if continued.  That it did not do so on this occasion was due to luck more than to foresight.  Many homeowners in this crime-beset city doubtless are armed.  When a woman sees a strange man, in plain clothes, prying up her bedroom window and climbing in, her natural impulse would be to shoot.  A plea of justifiable homicide might result awkwardly for enforcement officers.  But an officer seeing a gun being drawn on him might shoot first.  Under the circumstances of this case, I should not want the task of convincing a jury that it was not murder.  I have no reluctance in condemning as unconstitutional a method of law enforcement so reckless and so fraught with danger and discredit to the law enforcement agencies themselves.

*Id.* at 460-61 (Jackson, J., concurring).

As Justice Jackson foretold, a foreseeable risk of an unreasonable search is that the offending officers will be threatened by the resident.  Indeed, this is one of the bases for the knock-and-announce rule.  *See United States v. Combs*, 394 F.3d 739, 744 (9th Cir. 2005) ("protecting the sanctity of the home, preventing the unnecessary destruction of private property through forced entry, and avoiding violent confrontations that may occur if occupants of the home mistake law enforcement for intruders.").

In this case, it was foreseeable that opening the door to the shack without a warrant (or warrant exception) and without knocking-and-announcing could lead to a violent confrontation.  Mr. Mendez's "normal efforts" in picking up the BB gun rifle to sit up on the futon do not supersede Deputies Conley and Pederson's responsibility.  Therefore, the conduct of Deputies Conley and Pederson was the proximate cause of Mr. and Mrs. Mendez's injuries.

This conclusion is consistent with the tenet that the "Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for

1   self-defense within the home." *McDonald v. City of Chicago*, 130 S. Ct. 3020, 177

2   L. Ed. 2d 894 (2010); *District of Columbia v. Heller*, 554 U.S. 570, 628, 128 S. Ct.

3   2783, 171 L. Ed. 2d 637 (2008) ("[T]he need for defense of self, family, and

4   property is most acute" in the home).  Americans own firearms for many reasons,

5   including hunting, sport and collecting, but one of the main reasons is to protect

6   their own homes.  A startling entry into a bedroom will result in tragedy.

7   **E.**      **LIABILITY**

8         **1.      Personal Liability**

9         An officer only can be held liable for his or her "'integral participation' in the

10   unlawful conduct." *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996) (Section

11   1983 does not "allow group liability in and of itself without individual participation

12   in the unlawful conduct").

13         However, "'integral participation' does not require that each officer's actions

14   themselves rise to the level of a constitutional violation." *Boyd v. Benton County*,

15   374 F.3d 773, 780 (9th Cir. 2004); *see also Hernandez v. City of Napa*, No. C-09-

16   02782 EDL, 2010 WL 4010030, at *11 (N.D. Cal. Oct. 13, 2010) (the "integral

17   participant" rule "extends liability to those actors who were integral participants in

18   the constitutional violation, even if they did not directly engage in the

19   unconstitutional conduct themselves").

20         Moreover, in a situation where "each defendant might have committed an act

21   that is a tort when injury results (for there is no tort without an injury), but it is

22   unclear which defendant's act was the one that inflicted the injury – both shot at the

23   plaintiff, one missed, but we do not know which one missed. . . . both are jointly and

24   severally liable." *Richman v. Sheahan*, 512 F.3d 876, 884 (7th Cir. 2008) (citing

25   *Summers v. Tice*, 33 Cal. 2d 80, 199 P.2d 1 (1948)) (discussing liability for

26   excessive force under the Fourth Amendment).

27

28

1    Here, Deputy Conley is liable for unreasonably searching the shack without a

2  warrant or applicable warrant exception.  Deputies Conley and Pederson are jointly

3  and severally liable for unreasonably failing to knock-and-announce their presence.

4    On the provocation claim, there is no evidence as to which bullet(s) caused

5  each injury.  Deputies Conley and Pederson are jointly and severally liable for

6  unreasonable, excessive force under a theory of *Billington* provocation.

7    **2.    Vicarious Liability**

8    "A municipality or other local government may be liable under [Section

9  1983] if the governmental body itself 'subjects' a person to a deprivation of rights or

10  'causes' a person 'to be subjected' to such deprivation.  But, under § 1983, local

11  governments are responsible only for 'their own illegal acts.'  They are not

12  vicariously liable under § 1983 for their employees' actions." *Connick v.*

13  *Thompson*, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011) (citations omitted).

14    In this case, there is no direct claim for liability under Section 1983 against

15  COLA.  Nor can COLA be held vicariously liable under Section 1983 for the

16  wrongful conduct of Deputies Conley and Pederson.  This formal lack of liability is

17  not meant to undermine the legal obligation of COLA to pay the forthcoming

18  judgment.

19  **F.    DAMAGES**

20    The "basic purpose of a § 1983 damages award should be to compensate

21  persons for injuries caused by the deprivation of constitutional rights." *Carey v.*

22  *Piphus*, 435 U.S. 247, 254, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978).  "[W]hen §

23  1983 plaintiffs seek damages for violations of constitutional rights, the level of

24  damages is ordinarily determined according to principles derived from the common

25  law of torts." *Memphis Cmty. School Dist. v. Stachura*, 477 U.S. 299, 306, 106 S.

26  Ct. 2537, 91 L. Ed. 2d 249 (1986) (citations omitted).

27    "[N]o compensatory damages may be awarded in a § 1983 suit absent proof

28  of actual injury." *Farrar v. Hobby*, 506 U.S. 103, 112, 113 S. Ct. 566, 121 L. Ed. 2d

494 (1992) (citation omitted).  However, the "law of this circuit entitles a plaintiff to an award of nominal damages if the defendant violated the plaintiff's constitutional right, without a privilege or immunity, even if the plaintiff suffered no actual damage."  *Wilks v. Reyes*, 5 F.3d 412, 416 (9th Cir. 1993).

In awarding non-economic damages, the Court awarded an amount for Mr. Mendez that is sufficient – if invested prudently and not squandered – to raise his family in dignified circumstances.  The gist of Mr. Mendez's testimony was that the loss of his leg caused a loss of dignity and self-sufficiency.  In awarding non-economic damages to Mrs. Mendez, the Court is mindful that she was pregnant at the time she was shot.

## G.   STATE LAW CLAIMS

As noted above, Mr. and Mrs. Mendez also allege various tort claims under California law.

### 1.   Assault and Battery

Under California law, battery claims for excessive force by a law enforcement official are governed by the same reasonableness standard of the Fourth Amendment.  *See Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272-74, 74 Cal. Rptr. 2d 614 (1998) ("By definition then, a *prima facie* battery is not established unless and until plaintiff proves unreasonable force was used."); *see also* CACI 1305, Battery by Peace Officer; *Evans v. City of San Diego*, -- F. Supp. 2d --, 2012 WL 6625286, at *9 (S.D. Cal. Dec. 19, 2012) ("Plaintiff's [claim] for assault and battery flows from the same facts as her Fourth Amendment excessive force claim, and is measured by the same reasonableness standard of the Fourth Amendment.").

For the reasons discussed above, Deputies Conley and Pederson's use of force, at the moment of shooting, was objectively reasonable.  Accordingly, Mr. and Mrs. Mendez's claim for assault and battery fails.  In addition, the Court notes that

1  there appears to be no basis under California law to apply a theory of *Billington*

2  provocation to an assault and battery claim.

3      **2.**    <u>**Negligence**</u>

4      Likewise, under California law "negligence is measured by the same standard

5  as battery and excessive use of force under the Fourt[h] Amendment." *Morales v.*

6  *City of Delano*, 852 F. Supp. 2d 1253, 1278 (E.D. Cal. 2012); *McCloskey v.*

7  *Courtnier*, No. C 05-4641 MMC, 2012 WL 646219, at *3 (N.D. Cal. Feb. 28, 2012)

8  (same) (citing cases).

9      For the reasons discussed above, Deputies Conley and Pederson's use of

10  force, at the moment of shooting, was objectively reasonable.  Accordingly, Mr. and

11  Mrs. Mendez's claim for negligence fails – in this respect.

12      However, whether California law recognizes an analogue to *Billington*

13  provocation under a theory of negligence is an open question.  Importantly, in *Hayes*

14  *v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), the Ninth Circuit certified to

15  the California Supreme Court a question relating to "deputies' preshooting conduct

16  in the context of the claim to negligent wrongful death."  *Id.* at 869 ("[W]e request

17  that the California Supreme Court answer the following question:  Whether under

18  California negligence law, sheriff's deputies owe a duty of care to a suicidal person

19  when preparing, approaching, and performing a welfare check on him.").

20      For example, in *Hayes* the Ninth Circuit discussed the California Supreme

21  Court's decision in *Hernandez v. City of Pomona*, 46 Cal.4th 501, 94 Cal. Rptr. 3d 1

22  (2009):

23        In *Hernandez*, the court granted review to consider the following

24  question:  "When a federal court enters judgment in favor of the defendants in a civil rights claim brought under 42 United States Code section 1983 . . . , in which the plaintiffs seek damages for police use of

25  deadly and constitutionally excessive force in pursuing a suspect, and the

26  court then dismisses a supplemental state law wrongful death claim arising out of the same incident, what, if any, preclusive effect does the

27  judgment have in a subsequent state court wrongful death action?"  The

28  court held "that on the record and conceded facts here, the federal

1   judgment collaterally estops plaintiffs from pursuing their wrongful
2   death claim, even on the theory that the officers' preshooting conduct
    was negligent."

3        In doing so, the California Supreme Court did not hold that law
4   enforcement officers owed no duty of care in regards to preshooting
5   conduct, as the [California] lower courts . . . had.  Instead, the court
    found that the officers' specific preshooting conduct did not breach
6   applicable standards of care.  In light of this conclusion, the court in
    *Hernandez* declined to address the officers' claim that "they owed no
7   duty of care regarding their preshooting conduct."

8        The court's extended analysis of whether the officers' preshooting
    conduct breached the relevant standard of care indicated, however, that it
9   would likely not adopt the broad rule from [the California lower courts]
    that officers owe no such duty.  Indeed, in a concurring opinion, Justice
10  Moreno argued that the court should not have reached the issue "because
    plaintiffs are entitled to amend their complaint to allege preshooting
11  negligence."  The majority responded, stating "we find that plaintiffs
12  have adequately shown how they would amend their complaint to allege
    a preshooting negligence claim, and that we must determine whether any
13  of the preshooting acts plaintiffs have identified can support negligence
    liability."
14

15       There is disagreement within this court as to whether this
    discussion in *Hernandez* suggests that the California Supreme Court
16  would not follow the holdings in [the California lower courts]. . . .

17  *Id.* at 872 (citations omitted).

18       In the absence of clear direction from the California Supreme Court, the Court

19  concludes that California law does not provide for an analogue to *Billington*

20  provocation under a theory of negligence.  Furthermore, the Court believes that the

21  answer to the certified question in *Hayes* is unlikely to resolve this question as it

22  would bear on this case.  Accordingly, Mr. and Mrs. Mendez's claim for negligence

23  fails.

24       However, after the California Supreme Court decides the certified question in

25  *Hayes*, this Court will review that decision.  As appropriate, and on its own motion,

26  the Court will alter or amend the judgment in this case pursuant to Rule 59(e).

27

28

### 3. <u>**Intentional Infliction of Emotional Distress ("IIED")**</u>

Under California law, the "elements of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendants with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Campos v. City of Merced*, 709 F. Supp. 2d 944, 965 (E.D. Cal. 2010) (citing *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1001, 25 Cal. Rptr. 2d 550 (1993) (citation omitted). "For conduct to be extreme and outrageous, it must be 'so extreme as to exceed all bounds of that usually tolerated in a civilized community.'" *Id.* at 965-66(citing *Potter*, 6 Cal. 4th at 1001).

"In order to establish the second element, a plaintiff must show the conduct was especially calculated to cause severe mental distress." *Mitan v. Feeney*, 497 F. Supp. 2d 1113, 1126 (C.D. Cal. 2007) (citing *Ochoa v. Superior Court*, 39 Cal. 3d 159, 216 Cal. Rptr. 661 (1985)); *Ochoa*, 39 Cal. 3d at 165 n.5 (Under California law, "the rule which seems to have emerged is that there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is ***especially calculated to cause***, and does cause, mental distress of a very serious kind" (emphasis in original)).

Although the totality of Deputies Conley and Pederson's conduct was reckless as a matter of tort law, there is no evidence that their conduct was calculated to cause mental distress, and the actual decision to shoot was, by itself, justified. Mr. and Mrs. Mendez's IIED claim fails.

### III. <u>VERDICT</u>

**In favor of Plaintiffs Mr. and Mrs. Mendez and against Defendants Deputies Conley and Pederson.**

On the Fourth Amendment unreasonable search claim (based on warrantless entry, the Court awards Mr. and Mrs. Mendez **$1.00** in nominal damages.  As discussed above, only Deputy Conley is liable on this claim.

On the Fourth Amendment unreasonable search claim (based on failure to knock-and-announce), the Court awards Mr. and Mrs. Mendez **$1.00** in nominal damages.  As discussed above, Deputies Conley and Pederson are jointly and severally liable on this claim.

On the Fourth Amendment excessive force claim (based on conduct at the moment of shooting), the Court rules in favor of Deputies Conley and Pederson.

On the Fourth Amendment excessive force claim (based on *Alexander/Billington* provocation), as discussed above, Deputies Conley and Pederson are jointly and severally liable.  On this claim, the Court awards the following damages:

**<u>Plaintiff Angel Mendez</u>**

| | |
|---|---|
| Past Medical Bills: | $ 721,056 |
| Future Medical Care: | |
| Prosthesis upkeep and replacement: | $ 407,000 |
| Future surgeries: | $ 45,000 |
| Psychological care (5 years): | $ 13,300 |
| Attendant Care (4 hours/day at $12.00/hour) | $ 648,240 |
| Loss of Earnings: | $ 241,920 |
| <u>Non-Economic Damages:</u> | <u>$1,800,000</u> |
| Total: | $3,876,516 |

1     **Plaintiff Jennifer Lynn Garcia**

2     Past Medical Bills:           $     95,182

3     Future Medical Care:         $     37,000

4     <u>Non-Economic Damages:</u>    <u>$     90,000</u>

5     Total:                    $    222,182

6     On the California tort claims, the Court finds in favor of Deputies Conley and

7 Pederson.

8     The Court will enter a separate judgment pursuant to Federal Rule of Civil

9 Procedure 54 and 58(b).

10

11

12 Dated:  August 13, 2013            _____

13                        MICHAEL W. FITZGERALD
                         United States District Court Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28